WILLIAM MCGAFFIN *v.* CATHY ROBERTS
(11976)

SPEZIALE, C. J., HEALEY, PARSKEY, SHEA and GRILLO, Js.

Argued January 12—decision released June 19, 1984

*Daniel V. Presnick,* for the appellant (plaintiff).

*Peter M. Sipples,* with whom, on the brief, were *David J. Peska* and *Lynda B. Munro,* for the appellee (defendant).

ARTHUR H. HEALEY, J. This appeal involves a habeas corpus action instituted by the plaintiff, William McGaffin (father), to obtain custody of Cathy McGaffin (child), his four year old daughter, after the death of Lena McGaffin (mother), the child's mother who was the plaintiff's divorced wife. The habeas corpus was brought against the defendant, Cathy Roberts, the maternal grandmother (grandmother), who contested the action and requested that she be awarded custody. The trial court, after a full hearing, awarded custody to the grandmother with rights of visitation in the father as specified in its memorandum of decision. This appeal followed.

Among the facts found by the trial court are the following: The child was born on January 7, 1978. Her father and mother were separated in 1980 and divorced in 1981. At the time of the divorce, both parents agreed that the mother be awarded custody of the child. In awarding custody to the mother, the dissolution court also ordered that the father pay $25 per week for the support of the child. The father remarried shortly after the divorce.

The mother died suddenly on December 9, 1982, in Clinton where she and the child had made their own living arrangement since sometime in 1981. Prior to that, the father, mother and child had come up from Virginia in 1978 and moved into the grandmother's home. The mother and child remained at that home after the mother's separation from the father until sometime in 1981 when they moved down the street from the grandmother. Although they then lived in separate quarters, the child spent a substantial portion of each week with the grandmother.

At the time of the mother's death, a custody action, instituted by the father, was pending in the New Haven judicial district because the mother had withheld visitation after she had found bruises on the child following a weekend visit with the father. Temporary visitation had been reinstated by that court during the pendency of that custody action during which the father picked up and dropped off the child at the grandmother's home. Prior to the mother's death, she and her child had been receiving state welfare assistance and the state was investigating the father for delinquent support payments.

The trial court also found that the father exercised visitation rights " on a fairly regular basis" after his divorce and remarriage although visitation "[had] . . . been problematic for the child." It found that on at least two occasions the child returned from visitation so ill that she had to be hospitalized, once in March, 1981, for one week and again in June, 1981, for two weeks.[1] On one of these occasions, the father claimed that the child had a temperature when he picked her up and that the next day he took her to his present wife's physician after she had "bad vomiting fits." The father maintained that although the physician told him that the

---

[1] The trial court admitted as full exhibits the hospital records of these two hospitalizations.

child should be treated, the physician would not do so because the father was not the custodial parent and did not have the child's welfare medical card. The father did not contact the mother but, instead, took the child home and gave her aspirin. On the following day, a Sunday, he took the child to the beach place of his present wife's parents where the child again began vomiting and running a high temperature. He thereupon cut his visit short and dropped the child off at her grandmother's at noontime. On the other occasion, the child became ill during visitation. The father did not seek any medical attention but merely dropped the child off at her grandmother's with a high temperature.

The trial court found that on each of these occasions the father "failed to act appropriately in the face of very apparent and serious symptoms." It also noted that the father's present wife testified that there was nothing wrong with the child when she was returned to the grandmother's house. The trial court's memorandum also develops the incident of the bruise marks found on the child's arms by the grandmother after her return on April 18, 1982, from visitation with her father. The father's explanation of the bruise marks was that he had grabbed the child to keep her from falling off a bus from which he, his present wife and the child were alighting.[2] These bruises, which were on both arms, were observed by both a police officer to whom the child was taken and a worker with the department of children and youth services (DCYS) to whom the Clinton police had referred the matter as a suspected child abuse incident.[3] The child told the DCYS worker that her father had inflicted the bruises. Both the Clin-

[2] Both the father and his present wife testified concerning this "bus incident." In pointing out certain inconsistencies in their testimony concerning the incident, the trial court's memorandum points out that the present Mrs. McGaffin was sequestered during the testimony of her husband.

[3] The trial court pointed out that since the custody action was pending in the New Haven judicial district and the father was not the custodial par-

ton police officer and the DCYS worker described the bruise marks as finger marks in the flesh. The trial court found that the child had been grabbed hard enough to leave handprints on the arms.

The father, in describing his visitation, stated that the child would be nervous when she first arrived, but thereafter she would relax and play with toys he kept for her. On the other hand, the present Mrs. McGaffin said that the child was not nervous on her visits. Both agreed that the child "got along well with them on her visits and that there were no problems with her." At the trial, the grandmother and two maternal aunts described the child "as being very fretful and upset the day before she knows she is to visit her father and as crying before she gets picked up."

Additionally, the trial court pointed out that an "in chambers" session was held at the request of the attorneys who were allowed to question the child directly.[4] The trial court found that she was "a poised articulate little girl" who "understood what she was being asked and was not hesitant at all in giving her responses." The court also found that "[h]er responses were constantly negative as to her father and his wife and positive as to her grandmother." When asked why she said she felt "not good" about her father, she replied, "he hurt me" and when asked how, she said that he grabbed her by the arms. On the other hand, when asked how she felt about her grandmother, she answered, "good." In sum, the court opined that the child "makes it very clear that she wants to live with the grandmother." In this connection, the trial court pointed out that "[s]he looked well cared for, she sounded well cared for [and]

ent, the department of children and youth services went no further with their investigation and made no contact with the father.

[4] Present in chambers were counsel for the father and the grandmother, the court reporter and the court clerk; neither the father nor the grandmother was present.

she acted well cared for" and that "[s]he wants to stay where she has been for most of her young life, with her grandmother."

The position of the father at the habeas hearing was that as the sole surviving parent of the child his right to custody could not be challenged by the grandmother, who, as a stranger, lacks standing. The trial court states that while it is not disputed that the plaintiff is the father, that the mother died on December 9, 1982, and that the father's parental rights have not been terminated, what is in dispute is the father's claim "that he is a fit person to have custody and control of the child." After examining the evidence, including that given by the child as well as its own observations,[5] the trial court decided that it "must weigh this against the wishes of her father who comes across as a parent asserting his rights but as having failed to demonstrate that he could be a responsible, reliable caretaker." Here the court points out that it has "noted particularly the discrepancies in the accounts given by the plaintiff and his wife as to how they perceived the child's health needs, how she got the bruise marks [and] how she interacted with them and responded to them." The father's delinquency in the support payments was noted as well as the attribution to his present wife that she did not want to take care of children including his child. The trial court concluded that it could not justify removing the child from the grandmother and therefore granted custody to the grandmother.

In appealing from the judgment granting custody, the father has set out and briefed twenty-two claims

---

[5] We have said that the trial court "may properly take into consideration the subjective characteristics of a person which are involved in the issues of a case like this . . . ." *Claffey* v. *Claffey,* 135 Conn. 374, 376, 64 A.2d 540 (1949); *Dadio* v. *Dadio,* 123 Conn. 88, 192 A. 557 (1937).

of error.[6] After careful scrutiny of all of the father's claims of error, justice will be served by the consideration of certain claims of error.[7] They are that the trial court erred in: (1) holding that the grandmother had standing to "resist" the father's habeas corpus petition; (2) its interpretation of *Baram* v. *Schwartz*, 151

---

[6] We are constrained to comment upon the potential for meaningful appellate review of a number of the father's claims. Certain of the claims require reference to a transcript of the relevant proceedings. These include claims going to the admissibility and the consideration of certain evidence when due to a lack of transcript, we do not know whether any or all of them were properly preserved for appellate review. Practice Book §§ 3060F, 3060V. Moreover, the father's brief does not contain a single citation to a transcript although his brief makes assertions that require such references under our practice. See Practice Book § 3060F. Further, he assigns as error the ruling of *Harrigan, J.*, "requiring" the transfer of this case from the New Haven judicial district to the Middlesex judicial district. He does this despite the fact that his present counsel, who was also trial counsel, admitted before us that he stipulated to that transfer. Groundless assignments of error are not to be countenanced. See *Scribner* v. *O'Brien, Inc.*, 169 Conn. 389, 392 n.1, 363 A.2d 160 (1975). Moreover, there is no question that under the habeas corpus statute, venue was properly in the Middlesex judicial district because the child in question was alleged to be in the custody and control of her grandmother in the town of Clinton in that judicial district. See General Statutes § 45-42.

The father also claims error in the trial court's failure to appoint counsel for the child and in not ordering a family relations report before entering a final order. The grandmother's brief maintains that she, not the father, did in fact file such motions, but that the father "chose" not to have those motions heard. While we are aware that the court may act on such motions sua sponte, the grandmother's claims in this connection that the father did not seek action by the court here have not been answered. The father also claims in his brief that the court erred in not granting him "immediate visitation privileges." The grandmother counters that this was not requested anywhere in the papers filed in this case and that the lack of a transcript prevents the father from claiming in this court that he did so orally below. No answer has been forthcoming to this argument of the grandmother. The father also claims that the court erred in failing "to take notice of the felonious conduct and unclean hands of Cathy Roberts [the grandmother]." This issue is really no more than mentioned in the father's brief; briefing to assure appellate review requires more than that. It is sufficient to note that we have examined all the father's claims. See *Merrill Lynch, Pierce, Fenner & Smith, Inc.* v. *Cole*, 189 Conn. 518, 538, 457 A.2d 656 (1983).

[7] The claims of error we consider implicate others which we do not specifically set out.

Conn. 315, 197 A.2d 334 (1964); (3) failing to give the father the benefit of the presumption of parental fitness; (4) its interpretation of General Statutes § 45-43;[8] (5) deciding the case solely on the basis of "the best interest of the child" without regard to the father's constitutionally protected parental rights; and (6) its legal conclusion based on its finding of facts as set out in its memorandum.

There can be no lingering doubts that the family unit, including the rights of parent and child, is accorded constitutional protection. "The integrity of the family unit has found protection in the Due Process Clause of the Fourteenth Amendment, *Meyer* v. *Nebraska,* [262 U.S. 390, 399, 43 S. Ct. 625, 67 L. Ed. 1042 (1923)], the Equal Protection Clause of the Fourteenth Amendment, *Skinner* v. *Oklahoma,* [316 U.S. 535, 541, 62 S. Ct. 1110, 86 L. Ed. 1655 (1942)] . . . ." *Stanley* v. *Illinois,* 405 U.S. 645, 651, 92 S. Ct. 1208, 31 L. Ed. 2d 551 (1972); see *Armstrong* v. *Manzo,* 380 U.S. 545, 85 S. Ct. 1187, 14 L. Ed. 2d 62 (1965); *Meyer* v. *Nebraska,* 262 U.S. 390, 399, 43 S. Ct. 625, 67 L. Ed. 1042 (1923); *Pierce* v. *Society of Sisters,* 268 U.S. 510, 45 S. Ct. 571, 69 L. Ed. 1070 (1925). As it noted recently, the United States Supreme Court has now "recognized on numerous occasions that the relationship between parent and child is constitutionally protected." *Quilloin* v. *Walcott,* 434 U.S. 246, 255, 98 S. Ct. 549, 54 L. Ed. 2d 511, reh. denied, 435 U.S. 918, 98 S. Ct. 1477, 55 L. Ed. 2d 511 (1978); see *Santosky* v. *Kramer,* 455 U.S. 745, 753, 102 S. Ct. 1388, 71 L. Ed. 2d 599 (1982). "[A] father, no less than a mother, has a constitutionally protected right to the 'compan-

---

[8] General Statutes § 45-43, entitled "Father and mother joint guardians," provides: "The father and mother of every minor child are joint guardians of the person of the minor, and the powers, rights and duties of the father and the mother in regard to the minor shall be equal. If either father or mother dies or is removed as guardian, the other parent of the minor child shall become the sole guardian of the person of the minor."

ionship, care, custody, and management' of 'the children he has sired and raised, [which] undeniably warrants deference and, absent a powerful countervailing interest, protection.' *Stanley* v. *Illinois,* 405 U.S. 645, 651 [92 S. Ct. 1208, 31 L. Ed. 2d 551] (1972)." *Weinberger* v. *Wiesenfeld,* 420 U.S. 636, 652, 95 S. Ct. 1225, 43 L. Ed. 2d 514 (1975). Parental rights are not, however, beyond limitation in the public interest. *Prince* v. *Massachusetts,* 321 U.S. 158, 64 S. Ct. 438, 88 L. Ed. 645 (1944). The United States Supreme Court has stated that "biological relationships are not [the] exclusive determina[nts] of the existence of a family." *Smith* v. *Organization of Foster Families,* 431 U.S. 816, 843, 97 S. Ct. 2094, 53 L. Ed. 2d 14 (1977). One court puts it this way: "[T]he function of parenthood is not purely a matter of biology. Persons other than natural parents may occupy the relationship of parent to the child." *In re Palmer,* 81 Wash. 2d 604, 607, 503 P.2d 464 (1972). A state's constitutional interest extends to the welfare of the child. *Davis* v. *Smith,* 266 Ark. 112, 118, 583 S.W.2d 37 (1979); *In re William L.,* 477 Pa. 322, 336–39, 383 A.2d 1228 (1978).

We now turn to the father's claims of error. Initially, the father claims that the grandmother does not have standing[9] to "resist" his habeas corpus petition. He

---

[9] The father filed a special defense alleging that the grandmother lacked standing "to raise any claims for possession" of the child in the Superior Court and that her "sole remedy concerning this matter is to petition the court of probate in Branford to litigate her allegations." As we point out, the Superior Court has jurisdiction in a habeas corpus matter to determine child custody. We do not question the jurisdiction of a court of probate to determine child custody in a proper case. In the case before us, however, the habeas corpus action in the Superior Court was instituted by the service of process upon the grandmother on December 14, 1982. "In Connecticut, an action is commenced on the date of service of the writ upon the defendant. *Broderick* v. *Jackman,* 167 Conn. 96, 99, 355 A.2d 234 [1974]; *Seaboard Burner Corporation* v. *DeLong,* 145 Conn. 300, 303, 141 A.2d 642 [1958]; *Consolidated Motor Lines, Inc.* v. *M & M Transportation Co.,* 128 Conn. 107, 109, 20 A.2d 621 [1941]; *Spalding* v. *Butts,* 6 Conn. 28, 30 [1825]; *Jencks* v. *Phelps,* 4 Conn. 149 [1821]; *Clark* v. *Helms,* 1 Root 486

claims in his brief that mere physical possession of the child, unaccompanied by any other right to the child, cannot confer standing upon her where she might not otherwise have a legal right to petition for custody. He goes on and argues that we should not create a rule that naked possession with no other right to the child is sufficient to allow "an individual to defend or resist a habeas petition." He also claims that the trial court erred in its interpretation of *Baram* v. *Schwartz,* supra. We do not agree.

The defendant grandmother does have standing to "resist" the father's petition if for no other reason than that she is the target of the petition. The father cannot overlook the facts that he made her that target, that the *only* purpose served by the application for the writ is to secure the issuance of the writ in the discretion of the court and that "[t]he issues on which any subsequent trial is held are framed by the return and the pleadings subsequent thereto." *Adamsen* v. *Adamsen,* 151 Conn. 172, 176, 195 A.2d 418 (1963). Having made the grandmother a party, the father cannot claim that she is in no position to "resist" his petition. Black defines "resist" to mean "oppose" and "defend" to mean "[t]o oppose, repel or resist" as well as "[t]o contest and endeavor to defeat a claim or demand made against one in a court of justice." Black's Law Dictionary (5th Ed. 1979). Moreover, despite his claims under

[1793]." *Valley Cable Vision, Inc.* v. *Public Utilities Commission,* 175 Conn. 30, 33–34, 392 A.2d 485 (1978). The grandmother appears to have filed a petitition in the Clinton Probate Court sometime between December 15, 1982, and December 20, 1982, for the removal of the father as guardian of the person of the child under General Statutes § 45-43. That application sought the appointment of the grandmother as guardian of the person of the child. The Superior Court habeas corpus action was obviously instituted first. Because that court had jurisdiction to entertain and determine the question of custody, there is, under the circumstances, no merit to the father's claim that the relief sought by the grandmother is to be obtained solely in a court of probate. See *Don* v. *Frankel,* 136 Conn. 411, 71 A.2d 713 (1950).

General Statutes § 45-43, the time-honored function of habeas corpus in child custody cases with the ultimate question of what is in the best interests of the child militates against any such claim. The petitioner's reliance on § 45-43 strangely does not refer at all to the statutory scheme which, as we develop below, demonstrates that the legislature specifically provided that § 45-43 is a statute which "shall be liberally construed in the best interests of any minor child affected . . . ."[10]

The father also claims that the trial court erred in its interpretation of *Baram* v. *Schwartz,* supra, which it cited in the memorandum of decision as authority for the proposition that habeas corpus is the proper means for determining the right to custody of the minor child in this case. This claim is without merit. In *Baram,* we said that "[t]he writ of habeas corpus has long been recognized as a proper means of determining the right to the custody of a minor child, and the welfare of the child is the paramount consideration, whether the controversy is between the parents or between a parent and a stranger. *Antedomenico* v. *Antedomenico,* 142 Conn. 558, 562, 115 A.2d 659 [1955]; *Pfeiffer* v. *Pfeiffer,* [99 Conn. 154, 157, 121 A. 174 (1923)]." *Baram* v. *Schwartz,* supra, 318–19.

We further explicated the use of habeas corpus in child custody matters in *Pi* v. *Delta,* 175 Conn. 527, 530, 400 A.2d 709 (1978): " 'The use of habeas corpus to obtain custody was established at an early date . . . . When so used, the issue is not the illegality of confinement, as is normally the case, but rather what is best for the child.' 2 Stephenson, Conn. Civ. Proc. § 259 (a)

---

[10] General Statutes § 45-42b, entitled "Provisions construed in the best interest[s] of minor child," provides: "(a) The provisions of sections 45-42 to 45-45g, inclusive, shall be liberally construed in the best interests of any minor child affected by them.

"(b) All proceedings held under sections 45-42 to 45-45g, inclusive, shall, in the best interests of the minor child, be held without unreasonable delay."

p. 1063; *Kearney* v. *State,* 174 Conn. 244, 249, 386 A.2d 223 [1978]. A minor child is in the position of a ward of the state; *Howarth* v. *Northcott,* 152 Conn. 460, 464, 208 A.2d 540 [1965]; and '[t]he jurisdiction exercised by the court rests on its inherent equitable powers and exerts the force of the state, as parens patria[e], for the protection of its infant ward. *LaBella* v. *LaBella,* 134 Conn. 312, 316, 57 A.2d 627 [1948].' *Howarth* v. *Northcott,* supra, 464–65; *Doe* v. *Doe,* supra, 342–43 [163 Conn. 340, 342–43, 307 A.2d 166 (1972)]." In *Howarth,* we said that "[t]he very nature and scope of the inquiry [into what is best for the welfare of the child] and the result sought to be accomplished call for the exercise of the jurisdiction of a court of equity. In an equitable action the court endeavors to do complete justice. . . . 'Equity never does anything by halves.' " *Howarth* v. *Northcott,* 152 Conn. 460, 465, 208 A.2d 540 (1965).

Moreover, there is also statutory authority permitting a grandmother to intervene in a habeas corpus child custody controversy. General Statutes § 46b-57[11] permits such intervention of "any interested third party . . . upon motion . . ." and provides that the court, in making any order thereunder, "shall be guided by the best interests of the child . . . ."

---

[11] General Statutes § 46b-57, entitled "Third party intervention re custody of minor children. Preference of child," provides: "In any controversy before the superior court as to the custody of minor children, and on any complaint under this chapter or section 46b-1 or 51-348a, if there is any minor child of either or both parties, the court if it has jurisdiction under the provisions of chapter 815o, may allow any interested third party or parties to intervene upon motion. The court may award full or partial custody, care, education and visitation rights of such child to any such third party upon such conditions and limitations as it deems equitable. Before allowing any intervention, the court may appoint counsel for the child or children pursuant to the provisions of section 46b-54. In making any order under this section the court shall be guided by the best interests of the child, giving consideration to the wishes of the child if he is of sufficient age and capable of forming an intelligent preference."

The father next claims that the trial court erred in failing to give him the presumption of "parental fitness." As that claim implicates his claim that the court erred not only in its interpretation of General Statutes § 45-43, but also in deciding the case solely on the basis of the best interests of the child without regard for his constitutionally protected parental rights, we will consider all these claims together.

The father argues that as the surviving biological parent he was entitled to the presumption of parental fitness under General Statutes § 45-43,[12] which marks him as "a fit and proper parent" unless or until a third party disproves this fact. The trial court's memorandum of decision, he claims, however, clearly required *him* to establish that he was a fit and proper parent. In support of his claim that the trial court decided the case solely in the best interests of the child without regard to his constitutionally protected rights, the father makes the astonishing statement that "[t]here is a constitutional right which mandates that custody of a child be given to a biological parent" referring to *Santosky* v. *Kramer,* 455 U.S. 745, 102 S. Ct. 1388, 71 L. Ed. 2d 599 (1982). *Santosky,* unlike this custody case, was a termination of parental rights case and, in any event, is hardly authority for the father's unusual statement in this case.

First, with reference to his presumption of parental fitness under § 45-43, he depends upon his biological nexus with the child. We cannot accept this claim. As we have already said, the genetic connection is not determinative of the issue of the best interests of the child although it is certainly a factor. Additionally, the fact that he is the sole surviving parent whose parental rights have not been terminated hardly makes inevitable his entitlement to custody in this habeas

---

[12] See footnote 8, supra.

corpus proceeding. This latter circumstance, however, is a significant consideration on the issue of custody. We remain unconvinced that it is a "presumption" as that term is commonly referred to in our law. Rather, we view it as an expression of the natural importance of parenthood as a factor in the determination of what is in the best interests of the child.

In considering this claim of "presumption" as that term is referenced in our law; see, e.g., *Johnson* v. *Connecticut Co.*, 85 Conn. 438, 440–41, 83 A. 530 (1912), and cases there cited; we must remember that in this case the issue is not that of termination of parental rights but one of custody. This difference in the issues is a difference in kind and not in degree. This is so because of the substantial difference in the mandated result in each instance, i.e., the termination of parental rights which is final versus the award of custody which is modifiable. Compare *Hao Thi Popp* v. *Lucas*, 182 Conn. 545, 438 A.2d 755 (1980), with *Baram* v. *Schwartz*, supra, and *Claffey* v. *Claffey*, 135 Conn. 374, 64 A.2d 540 (1949). Acknowledging the natural importance of parenthood as we have, we must recognize that § 45-43 is under the explicit "best interest" mandate of § 45-42b.[13] Thus, the factor of parenthood is to be properly considered in the aggregate of all those circumstances that a trial court is entitled to consider in exercising its broad discretion in deciding what is in the best interests of a minor child. Section 45-42b is a clear legislative recognition that any formulation which focuses *entirely* on the respective rights of the contesting parties has no real part in this statutory

[13] General Statutes § 45-42b entitled "Provisions construed in best interest[s] of minor child" provides in part: "(b) All proceedings held under sections 45-42 to 45-45g, inclusive, shall, in the best interests of the minor child, be held without unreasonable delay."

In that regard, the record discloses that the original habeas petition was filed in the trial court on December 15, 1982, and that judgment was rendered on January 26, 1983.

scheme since the crucial issue is the best interest of the child. The constitutional concerns are not entirely parental because the preservation of family integrity "encompasses the reciprocal rights of both parent[s] and children." *Duchesne* v. *Sugarman,* 566 F.2d 817, 825 (2d Cir. 1977).

The father would have us view his claim to custody solely under that language contained in § 45-43. In doing so, he does not refer to § 45-42b which immediately precedes § 45-43 and expressly provides: "(a) The provisions of section 45-42 to 45-45g, inclusive, *shall be liberally construed in the best interests of any minor child affected by them* . . . ." (Emphasis added.) This statute was enacted quite some time after § 45-43. This subsequent legislative act throws light on the legislative intent of an earlier related act. *Baker* v. *Norwalk,* 152 Conn. 312, 317, 206 A.2d 428 (1965); see, *Bisi* v. *American Automobile Ins. Co.,* 137 Conn. 424, 431, 78 A.2d 533 (1951). Even if it were claimed that it merely codified an equitable principle that existed prior to its passage; *General Realty Improvement Co.* v. *New Haven,* 133 Conn. 238, 242, 50 A.2d 59 (1946); and articulated the authority which the court had under its general equitable powers, it is an unambiguous declaration of legislative intent and an acknowledgement of the standard to be used on the issue of custody even where the surviving biological parent claims entitlement to custody of the person of his minor child under § 45-43. We need hardly say here that "[i]t is ancient [and yet enduring] wisdom that statutes should be interpreted so as to effectuate their manifested purpose or object." 2A Sutherland, Statutory Construction (4th Ed. Sands) § 58.06, p. 474.

Further, we also cannot accept the father's claim that the trial court clearly required him to establish that he was a fit and proper parent. In the trial court's lengthy memorandum of decision there are two statements

upon which this claim appears to be based. We find that these statements are clearly interrelated. First, after pointing out that it was not disputed that the father was the surviving parent of the child and that his parental rights had not been terminated, the trial court said that "[w]hat is disputed is [his] claim that he is a fit person to have custody and control . . . ." Second, after a thorough discussion of facts found on which the trial court had obviously resolved conflicts in the evidence in favor of the grandmother's claim to custody, the memorandum contains this statement: "The court must weigh this against the wishes of her father who comes across as a parent asserting his rights but as having failed to demonstrate that he could be a responsible, reliable caretaker." It then goes on to indicate certain conclusions that resulted in its award of custody to the grandmother with visitation rights to the father.

The memorandum of decision must be read as a whole to put these statements in fair context. We examine the trial court's memorandum of decision to understand better the basis of the court's decision and to determine the reasoning for the conclusion reached by the trial court. *Bierman* v. *Westport Planning and Zoning Commission,* 185 Conn. 135, 136–37, 440 A.2d 882 (1981), and cases there cited. An examination of the memorandum of decision discloses that the trial court fully considered the father's claim that "as the sole surviving parent . . . [his] right to custody cannot be challenged by the defendant . . . ." There is no doubt that the trial court understood and employed the "best interests" standard as the ultimate basis of its decision. As the court specifically said in its memorandum, it did "weigh" the evidence in favor of the grandmother's claim to custody as against the evidence which favored the father "asserting his rights." Recognizing the father's assertion of his rights, the trial court on

all the evidence applied the "best interests" standard and decided to award custody to the defendant grandmother. In doing so, it did not act in derogation of any of the father's constitutional rights which, as we have already pointed out, are not absolute.

Finally, the father claims that the trial court erred in its legal conclusion based on its finding of facts in its memorandum of decision. Here he argues that the factual determination of the court does not establish either that the best interests of the child required that custody be awarded to the grandmother or that she was a "better custodial parent." Further, he asserts that in "applying the correct legal standard to the factual determinations made by the court, even viewing all the evidence most favorable [sic] to the defendant, the conclusion is inescapable that the court must return the child to the biological father . . . ." We cannot accept this claim because, as we have already stated, the trial court applied the proper legal standard. Moreover, the validity of any claim that the trial court's decision is not supported by the evidence may be tested only by reference to the record together with the transcripts and exhibits filed in the case; see *Morningside Assn.* v. *Morningside Development, Inc.,* 172 Conn. 60, 63, 372 A.2d 141 (1976). The father has not filed a transcript of all the evidence; see Practice Book §§ 3060F, 3060V; and therefore we cannot properly review any such claim.

"On appeal, it is the function of this court to determine whether the decision of the trial court is clearly erroneous. See Practice Book, 1978, § 3060D. This involves a two part function: where the legal conclusions of the court are challenged, we must determine whether they are legally and logically correct and whether they find support in the facts set out in the memorandum of decision; where the factual basis of the court's decision is challenged we must determine

whether the facts set out in the memorandum of decision are supported by the evidence or whether, in light of the evidence and the pleadings in the whole record, those facts are clearly erroneous." *Pandolphe's Auto Parts, Inc.* v. *Manchester,* 181 Conn. 217, 221–22, 435 A.2d 24 (1980). Measuring by this standard, we find no error in the trial court's decision.

There is no error.

In this opinion SPEZIALE, C. J., SHEA and GRILLO, Js., concurred.

PARSKEY, J., dissenting. Section 45-43 of the General Statutes provides for the joint guardianship in both parents of their minor child. It also provides that "[i]f either father or mother dies or is removed as guardian, the other parent of the minor child shall become the sole guardian of the person of the minor." The right to custody of a minor child is one of the principal attributes of guardianship of the person. *Miller* v. *Miller,* 158 Conn. 217, 220, 258 A.2d 89, cert. denied, 396 U.S. 940, 90 S. Ct. 374, 24 L. Ed. 2d 241 (1969); *Boardman* v. *Boardman,* 135 Conn. 124, 129, 62 A.2d 521 (1948). The majority takes passing notice of the statute and then concludes that in some fashion it has been swallowed up in the "best interest of the minor child" provisions of § 45-42b.[1] Although one may marvel at the dexterity with which this has been accomplished, the decisional gloss which has been placed on this statute will not countenance so convenient a disappearance.

---

[1] The fact that under § 45-42b "[t]he provisions of sections 45-42 to 45-45g, inclusive [are to] be liberally construed in the best interests of any minor child affected by them" does not mean that the language contained in these sections is to be ignored. For example, § 45-43a provides that any adult relative may apply to the probate court for the removal of a parent as guardian and § 45-44c authorizes the probate court to remove a parent as guardian where it is shown, inter alia, that he is unfit or that there is no ongoing parent-child relationship and that to allow further time to establish such relationship would be detrimental to the child's best interest. Does the

In all custody disputes, what is in the best interests of the child is the ultimate concern. General Statutes § 45-42b embodies that principle. In a dispute between a parent and a nonparent, however, this is the end of the analysis, not the beginning. The troublesome issue is, in the quest to determine what is in the best interests of the child, how do we honor the constitutional; *Quilloin* v. *Walcott,* 434 U.S. 246, 255, 98 S. Ct. 549, 54 L. Ed. 2d 511, reh. denied, 435 U.S. 918, 98 S. Ct. 1477, 55 L. Ed. 2d 511 (1978); *Stanley* v. *Illinois,* 405 U.S. 645, 651, 92 S. Ct. 1208, 31 L. Ed. 2d 551 (1972); and statutory; General Statutes § 45-43; interests of the parent. The majority's response is to ignore them. In its view, the parent and the nonparent compete as equals, with the biological nexus treated as one of many factors to be considered in the determination of the best interests. In its rush to determine what is in the best interests of the child the majority unnecessarily sacrifices the rights of the parents. In my view we only need to resort to § 45-43 and the cases that have construed it to arrive at a result which harmonizes these competing interests.

It has long been the law in this state that prima facie the legal right to the custody of a minor child is in the surviving parent. *Kelsey* v. *Green,* 69 Conn. 291, 298, 37 A. 679 ( 1897). Although the welfare of the child must be the controlling consideration "where the controversy is not between the father and the mother, as it was not in this case, the [father] has a prior right to custody unless the circumstances are such that to give it to [him] would not be for the best interests of the child." *Claffey* v. *Claffey,* 146 Conn. 104, 109–10, 148 A.2d 140 (1959). General Statutes § 45-43 rein-

majority suggest that under the liberally construed best interests standard contained in § 45-42b a probate court would be authorized to remove a parent as guardian whenever the court found that such removal was in the best interests of the child without specifically finding the specified statutory predicate for such removal? I think not.

forces that priority by declaring that the surviving parent is the sole guardian of the minor child.

Therefore, to give the parent's priority its just due the burden must clearly fall on the nonparent to disprove this priority. This burden is a heavy one. The nonparent must do more than assert that it would be in the best interests of the child to live with the nonparent; she must prove that it would be detrimental to the best interests of the child to live with the parent. As we warned in *Antedomenico* v. *Antedomenico,* 142 Conn. 558, 563, 115 A.2d 659 (1955), it will not be enough for the nonparent to prove that she can provide a better standard of living for the child. Nor will it be enough for the nonparent to assert that it is in the best interests of the child to keep her in the present nurturing environment of the nonparent. The nonparent must prove that it would be detrimental to the child to take her out of that environment and place her with the parent.

Since, as the majority recognizes, this case implicates the parent's liberty interest, it requires a due process analysis. Due process is a flexible concept and calls for such procedural protections as the particular situation demands. *Morrissey* v. *Brewer,* 408 U.S. 471, 481, 92 S. Ct. 2593, 33 L. Ed. 2d 484 (1972). Whether a particular procedure comports with due process requires an analysis of the governmental and private interests that are affected. Identification of the specific dictates of due process generally requires consideration of three distinct factors. "First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement

would entail." *Mathews* v. *Eldridge,* 424 U.S. 319, 335, 96 S. Ct. 893, 47 L. Ed. 2d 18 (1976).

The private interest affected, that of a surviving parent who is accorded a priority to custody by law, is compelling. See *Stanley* v. *Illinois,* supra. The risk of error from not giving that priority presumptive effect is substantial. For example, if the only issue before the court in a custody dispute between a parent and a stranger is the best interests of the child, how is one to know whether, in a given case, custody may not be awarded on the basis of who would be the better provider, the very basis we said could not be used in *Antedomenico?* The countervailing governmental interest, favoring considering the parent's interest as one factor among many, is comparatively slight, but even more important, would be more adequately served by a procedure which harmonized the best interests of the child standard with the policy declaration according the surviving parent sole guardianship of the person.

This case should be viewed not as an isolated occurrence but rather as a paradigm of problems faced by the children of divorce. Divorce is a traumatic event which shatters the relationship between husband and wife. It is not intended nor should it be encouraged to shatter the relationship between a noncustodial parent (in most cases the father) and child. Our society is based on the premise of a nuclear family unit. When that unit is destroyed a custodial choice must be made between the competing interests of the two parents. The noncustodial parent usually is relegated to the role of financial supporter and occasional visitor. Nevertheless, it is hoped that the relationship between noncustodial parent and child, though diminished, will be maintained. If the custodial parent dies and the noncustodial parent is a suitable custodian then there is no reason why he should not become such custodian. The purpose of § 45-43 is to give the noncustodial par-

ent one leg up in any custody dispute. In my view he should be awarded custody unless the nonparent can show that to award him custody would be detrimental to the child's best interests.

The trial court did not determine that the plaintiff father was an unfit parent. Nor did it determine that returning the child to her father would be detrimental to her best interests. What it did determine was that the father failed to demonstrate that he could be a responsible, reliable caretaker and that removing the child from the nurturing environment of her grandmother would cause the child to suffer a grievous loss. In so finding the trial court misapplied the law. If the test in a custody suit between a parent and a stranger or relative for whom the child has developed an attachment is to be solely determined by the effect on the child of her removal from her nurturing environment, then I am afraid that the award of custody in a dissolution proceeding to all intents and purposes will become a severance of the parental relationship between the child and the noncustodial parent. Because I believe that in awarding custody to the defendant the trial court misapplied the law, I would vacate the judgment and order a new trial.