[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
Kevin, born May 24, 1987, was committed to the Commissioner of Children and Youth Services (hereafter, DCYS) on December 7, 1988 based on a July 22, 1988 neglect petition; the commitment was extended on April 24, 1990. In the interim, a petition to terminate parental rights was filed on October 31, 1989. For a variety of reasons the trial was delayed. CT Page 6134
The termination ground is Gen. Stat. 17a-112 (formerly 17-43a) (b)(2): "The parents of a child who has been found by the superior court to have been neglected or uncared for in a prior proceeding have failed to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of the child, they could assume a responsible position in the life of the child." The court appointed attorneys for the child and each parent. The mother has voluntarily and knowingly consented to termination of her parental rights. The father contests. The court grants the petition against both parents.
The procedure for hearing this case is described in In re Shannon S., 41 Conn. Sup. 145, 146, 150 (1989).
The public policy of Connecticut is to strengthen the family and to make the home safe for children and to provide a permanent environment when necessary. 17-38a(a). Termination is a serious and sensitive judicial action resulting in a complete severance in the family. Yet any natural rights of parents are not absolute. McGaffin v. Roberts, 193 Conn. 393,400-401, 479 A.2d 176 (1984).
 II.
The July 22, 1988 neglect petition was directed against the mother as the physical custodial parent. At that time, the father was an inmate at the Connecticut Correctional Institute. The father, represented by counsel, was present on December 7 and specifically agreed to the dispositional commitment. On October 30, 1990 the court ordered a transcript when the father through counsel denied he had agreed to the commitment. See Transcript, December 7, 1988, page 3.
The social study filed in connection with the 1988 neglect disposition does describe the father's background.46b-129 (c); P.B. #1044. As a child he was sexually and physically abused by his father. He was happy when his father died and had anger and hostility toward his parents. Hyperactive, he described himself as partially retarded (probably incorrectly) and anti-social. The father as a child was in foster homes, Seaside Regional Center, Norwich State Hospital and the adolescent unit at Connecticut Valley Hospital The father married the mother in January 1987. But a couple of weeks later he was arrested for sexual assault on the mother's thirteen year old cousin. The father was incarcerated from February 1987 and was sentenced to a four years imprisonment with five years probation. The father was in the Psychiatric Unit at Somers from December 1987 to at least the} preparation of the social study in August 1988. He was released CT Page 6135 from Somers/Hartford Correctional in June 1991.
Kevin was placed in a foster home from August 17, 1987 to September 24, 1987 and has remained continuously in foster care from April 1988. For reasons unrelated to the child, he must be now moved to a new foster home which could be an adoptive home. The child is eminently adoptable.
The father at commitment advised DCYS he wished to maintain visitation; as part of the agreement for disposition, DCYS agreed to provide visitation at Somers for the father, possibly every couple of months. The father had not seen his son from birth until the hearings in connection with the initial commitment. Evaluations of both parents were ordered to assist in planning appropriate services for reunification. See also, expectations, 12-88; Transcript, December 7, 1988.
On February 7, 1989, the father requested that DCYS provide a monthly report on his son and arrange for visitation every three months.
A May 11, 1989 DCYS status report indicated the child had seen his father on a "couple of occasions." The parents were divorced in June 1989. The DCYS study filed in connection with the April 1990 extension reported the father had been transferred from Somers to Cheshire; the father had seen his son at the correctional facilities and during court appearances. (In addition, there had been contact during the court ordered evaluations). In October 1990 and May 1991, the father continued his opposition to termination. In September 1990 the father was transferred back to Somers.
 III.
In accordance with the court orders, evaluations of parents and child were accomplished in January 1989 with subsequent updates. Both evaluators testified at trial.
Dr. Hopson, the psychologist, concluded in January 1989 that the father had an extensive history of emotional and social difficulties creating the likelihood Kevin would be neglected or abused if left to paternal care. Based on his unstable background and psychological functioning, it was highly unlikely the father could parent Kevin without high risk for neglect and abuse. The childhood sexual abuse of the father and his own perpetration of sexual abuse as an adult created further risk for Kevin. The evaluator suggested termination to free Kevin for a stable and secure environment for the child's fullest potential. State's Exhibit S-3. CT Page 6136
Two years later in December 1990, Dr. Hopson again evaluated the parent and Kevin. Kevin, a fairly well adjusted child, was about 3 1/2 years old and the father had not seen his son for almost a year. Kevin treated his father as a friendly acquaintance. The father advised Dr. Hopson that he was taking a psychology course in prison. The father expressed strong interest in caring for his son, even with extended periods of supervision.
Nevertheless, the evaluator concluded that the father was fairly superficial and defensive in rationalizing his misbehavior. He failed to show guilt or remorse over the sexual assault. The father lacks an adequate role model and has very little insight into his behavior and its impact on others. Without a realistic understanding of parenthood, the father fantasizes about raising his son. Therefore, the father was currently inadequate as a primary provider and his therapeutic needs are a long term endeavor. As between foster care and the father, Dr. Hopson recommended foster care rather than the father so as to provide Kevin with a nurturing and safe environment in which to develop in a healthy manner; any visitation should be supervised and contingent on addressing those needs, States Exhibit S-4.
Dr. Hopson testified at the hearing that the father needed intensive individual psychotherapy for a couple of years. The witness was pessimistic about the success of any therapy for the unmotivated father perceives himself as a victim. In addition the father was deficient in parenting skills. The child has been in foster care almost all of his young life, and now needs a healthy and stable environment. Healthy bonding, not to an unhealthy person, and without further delay.
Dr. Sadler, the psychiatrist, found in January 1989 that the father's judgment was so seriously distorted that any person involved with him would be at significant risk of physical or sexual assault. The father displayed an extraordinary indifference to law and social conventions. Confirming Dr. Sadler's observation, the father testified in these proceedings that the sexual abuse of a 13 year old girl was the lesser evil of any other alternative. The father was surprised in 1989 that his parenting ability was in question even though he had seen his son only at court appearances. The father suffers from a character disorder that is pervasive and distorts his relationships and is exceedingly unlikely to change even over years of intense effort. The father lacks real understanding of a child's needs and the clear ability to parent; he saw no use for supportive services. The ultimate conclusion: the father is not only inadequate to the CT Page 6137 requirements of providing minimally adequate parenting to a child but he would present a danger to anyone placed in his care." State's Exhibit S-1.
On the follow-up evaluation in early 1991 the father was more at ease and confident. The father claimed some private counselling at Somers. Although he had by then seen his son only at court appearances, the evaluation and several visits at Somers he described himself as a fine father. The father projects a "not too bad" relationship between father and son. The father is oblivious to the lack of a relationship to his son and the normal needs of a young child. The father believes the blood relationship is most important between himself and his son. The father consequently has shown no ability to establish a father/son relationship; the father's inappropriate behavior is inconsistent with an adequate relationship. Following his release from prison he projected a possible rescue mission to retrieve missing children; he also advanced himself as a lecturer on sexual abuse of children. The father is still a seriously character disordered individual with a possible affective disturbance.
The psychiatrist found that Kevin in 1991 was a well functioning child with no clearly established attachment to either parent.
Under the circumstances the evaluator recommended that neither parent care for Kevin in an unsupervised manner at any time in the future. He further recommended termination now rather than further delay Kevin's opportunity to bond to a new family on the highly unlikely possibility that the natural parent can provide a healthy home. Delay in facilitating any adoption possibilities creates additional stress on Kevin's ability to bond to an adoptive family. The delay has now been too long. State's Exhibit S-2.
During his testimony at trial, Dr. Sadler confirmed his conclusions that rehabilitation of the father would be a long hard process which still might not succeed. Kevin needs a permanent placement now; he already has suffered from the current uncertainty. The court ought not to wait but the father's post imprisonment activities. Dr. Sadler did not believe the father's "personal counselling" at prison was the sophisticated individual treatment of choice.
The court finds the testimony of the evaluators persuasive and confirmed by the father's own court testimony. Psychological testimony from professionals is accorded great weight. In re Nicoline, T. 9 Conn. App. 598, 605, 520 A.2d 639
(1987). The court can consider the father's past behavior to CT Page 6138 evaluate future parenting ability that can foster Kevin's growth, development and well-being. Yontef v. Yontef,185 Conn. 275, 283, 440 A.2d 899 (1981).
 IV.
The initial termination social study was done in October 1989. Based on the evaluations and contact with Kevin, DCYS requested termination of parental rights to prevent an indefinite foster care placement. State's Exhibit S-5. An Addendum was filed on February 28, 1991. State's Exhibit S-6. O'Neill v. O'Neill, 13 Conn. App. 300, 302-303, 536 A.2d 978
(1988). DCYS again recommended termination for adoption. In addition to the reports, DCYS worker O'Brien testified. While incarcerated the father was soon voted out of group therapy for sexual offenders when other members claimed he breached confidentiality. In late 1990 the father saw a psychiatrist in prison, presumably the therapist noted by Dr. Sandler.
DCYS has arranged eight visits at most at court appearances, evaluations and Somers. DCYS will not now permit unsupervised visitation; the father would first need parenting classes and personal therapy.
While conceding a limited relationship, the father insisted that as Kevin was of blood, a parental bond would grow; God wants parents to raise their children. The father sees no problem to eventual reunification even though the father admits he still needs counselling following release; he also needs a job and housing.
Although the father admits a prior son, he has had no contact with that child after a one year protective order expired in 1987. Apparently his reliance on concept of blood ties applies to Kevin but not to the older child. On the other hand Dr. Sadler related an accusation from Kevin's mother that there may be no son but two daughters whom he raped even after being in a therapy program. Before the father took the fifth amendment at trial, he did admit the thirteen year old cousin was not his only victim. The issue was not pursued, but even that bare admission lends further credibility to the testimony of the evaluators.
 V.
The sole statutory grounds for termination in this case consists of two parts, both of which must be established by clear and convincing evidence before disposition or best interest can be considered. In Re Jessica M., 217 Conn. 459,465, — A.2d — (1991). It is not enough that the father CT Page 6139 has been incarcerated from before the birth of his son until days ago. When the father was sentenced in the criminal court, he was not stripped of his status as natural father or automatically deprived of his son. In re Juvenile Appeal (84-6), 2 Conn. App. 705, 711, 483 A.2d 1101 (1984). Nor is it enough that the father was not the custodial parent at the time of the neglect commitment Cf. In re Juvenile Appeal (Anonymous), 177 Conn. 648, 420 A.2d 875 (1979). Apart from the incarceration in this case we know the father's personal and parental status which would have blocked his efforts at custody in 1988.
The first part of the statutory grounds is degree of personal rehabilitation achieved since the prior commitment. "Personal rehabilitation" refers to the restoration of this father to a constructive and useful role as a parent even with the use of available support programs. In re Migdalia M.,6 Conn. App. 194, 203, 504 A.2d 532 (1986). While the father's overall psychological and psychiatric status may have improved from 1988 he has not yet achieved such minimal resolution of his personal problems so as to function as an acceptable parent. He cannot assume a responsible position in the life of Kevin.
But even if the father has not yet achieved a high enough level of personal rehabilitation the state must still establish the second part of the adjudication test: can the father assume a responsible position in the life of Kevin, considering his age and needs, within a reasonable time. In re Luis C., 210 Conn. 157, 164-169, 554 A.2d 722 (1989). While a responsible position is not always a full time caretaker, the evidence in this case clearly convinces that this father may never resolve his internal problems inhibiting a health and safe parental role. The father seems fascinated with the concept of blood bonding; his faith may be self defeating. Even if his problems are resolvable, the father must undergo lengthy therapy beyond a reasonable time for Kevin. In re Migdalia M., supra, 206-208.
 VI.
Having met the statutory grounds, the state has also convinced the court that it is in Kevin's best interest to terminate.
The child has been in foster care almost all of his life, without interruption for the last 3 years. There must be permanent planning for Kevin to meet his needs. The needs of the son should not be bound into any fantasy of the father. CT Page 6140
While it is true that Kevin must be shifted from his present foster home to a new location, even the father does not suggest he is presently ready to accept full care of Kevin in his best interest, Kevin can be available for current adoption within a reasonable time creating a real bonding opportunity in a healthy and safe environment. Kevin would no longer be locked into the unacceptably lengthy and uncertain rehabilitation efforts of the father. Kevin could come out of storage.
For an unreasonable period of time, Kevin would be at risk with his father. DCYS is required to promote family integrity only when reunion does not endanger the child. In re Juvenile Appeal (84-AB), 192 Conn. 254, 258, 471 A.2d 1380
(1984).
The court must consider in writing six factors in17a-112(d) (formerly, 17-43a(d)) as part of the disposition. In re Barbara J., 215 Conn. 31, 47, — A.2d — (1990). Supplementing the conclusions already made in this memorandum, the court makes additional findings.
Because of the father's incarceration, DCYS could not provide direct services to him. Visitation was arranged but limited to unnatural settings: court, professional offices, and correctional institution. The Correction Department offered group therapy sessions for sex offenders, but the father was rejected by the group. There was recently some personal counselling at Somers. The father could have written more or sent gifts to the child through DCYS.
There was no applicable court order at time of commitment. Although the father signed the expectation sheet, the expectations more properly related to the mother.
Kevin does not relate to his father as a parent. Whatever ties Kevin has to his foster mother, that relationship is about to end. The father has had limited contact with his son. The father wrote three or four letters to his son. Although the father knew the location of the foster home, he failed to phone. The father did not contact or communicate with the foster mother either directly or through DCYS.
The father's efforts to adjust his circumstances or conduct has been severely restricted by his condition of program at prison except for some recent counselling. He may have received a GED degree.
The father has not been prevented from maintaining a meaningful relationship by the unreasonable act or conduct of CT Page 6141 the mother or DCYS. The fault lies within him. The inhibiting factors have been his incarceration and his character/personality. He failed to take advantage of possible remedial opportunities, however understandably limited by his location and personality. The father's confined economic circumstance did hamper his ability to maintain contact. The father nevertheless, has always expressed love and concern for Kevin.
 VII
Accordingly, the court finds that upon clear and convincing evidence that termination is in the best interest of the child and (1) the mother has voluntarily and knowingly consented to termination of her parental rights with respect to Kevin and (2) the father, the parent of a child found to have been neglected in a prior proceeding, over an extended period of time not less than one year, has failed to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of Kevin, he could assume a responsible position in the life of Kevin.
The court grants the termination petition. The Commissioner of DCYS is appointed statutory parent. DCYS shall report to the court within ninety days on a case plan and at least every twelve months thereafter shall report on implementation of the plan. The court shall review the plan at least once a year until adoption has become finalized.17a-112 (f)(i).
Goldstein, J.