[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
Articulation of Decision Rendered August 17, 1995
Procedural Context
On June 20, 1994, Dr. John Levanthal, Director of the child abuse section of Yale New Haven Hospital ("DART") executed an affidavit which concluded:
I believe that Ellena D. And Calvin W. are at imminent risk CT Page 1365-UUU of further serious injury or of dying from abuse if they are allowed to return home.
Two days later, on the strength of this affidavit, the Department of Children and Families (DCF) filed a petition alleging that Ellena D., born 1/20/92, and Calvin W. III, born 1/13/94, half sister and twin brother respectively of a child who had died on 6/10/94 of causes which remain unresolved to the present time, to be neglected and/or abused children after X-rays showed multiple healing fractures in the bones of both the living and dead twins. Although Ellena had suffered three physical injuries within a short period during her earliest childhood, none of them had been identified by DCF at the time as child abuse. Unlike her twin half brothers, she had suffered no recent injuries but was alleged to be living under conditions injurious to her wellbeing while in the care of her mother, Denise D., and stepfather, Calvin W. Jr. Both children were removed from home under an ex parte Order of Temporary Custody (OTC) pursuant to subsection (b) of Sec. 46b-129 of the Conn. Gen. Stats. (Rev. 1993).
At the time of filing these petitions, Denise D. had informed DCF that she did not know the whereabouts of Ellena's acknowledged father, John Dg., who was, therefore, served by publication and failed to appear at the mandated OTC hearing on 6/27/94. It was learned subsequently that John Dg. had lived intermittently. and had always been able to receive mail, at the home of his parents for years before beginning the relationship with Denise that resulted in Ellena's birth. In the OTC hearing, Denise and Calvin Jr., in the absence of John, agreed to the continuance of the OTC on both children, and DCF agreed that they could be moved from an unrelated foster home to that of the paternal grandparents of the surviving twin, the Ws. By 9/13/94 John had learned of the case and filed a pro se appearance.
By the end of October, 1994, permission had been granted to three sets of grandparents and a maternal aunt to intervene since each of the intervenors were offering their homes to these children in the event they would not be permitted to return to the care of Denise, whether or not she continued to live with Calvin Jr., as she did intermittently throughout the pendency of this litigation. Although their motions to intervene had been granted as to disposition only, all four intervenors were permitted to attend and participate at every pre-adjudicatory hearing and case conference, file motions for finely-tuned CT Page 1365-VVV visitation and for contempt when any departure from visitation schedules occurred.
Trial was scheduled to begin in November, five months after the children had been removed under the OTC. Shortly before the trial date. however, the court granted the motion of Denise and Calvin Jr. for a physical examination of Calvin III to determine if any "brittle bone disease" could have been responsible for each twin's multiple fractures. After hearings attended by all parties and intervenors and their counsel concerning motions, visitation and contempt citations, held on 11/30/94, 1/6/95, 2/7/95, 3/32/95, 5/18/95, 5/24/95 and 6/9/95, a trial date certain was agreed upon to begin on 6/27/95, exactly a year after the OTC had been confirmed, after results of the physical testing revealed no anomalies that could explain the multiple fractures suffered by the twins.
At the outset of the trial, the three parents (Denise and John, parents of Ellena; Denise and Calvin Jr., parents of Calvin III) entered pleas of nolo contendere as to all of the allegations of the petitions. Following a canvas by the court, these pleas were accepted and an adjudication made that both children had been abused and neglected, as originally pleaded. The balance of the allotted two days of trial was concerned with the disposition that would be consistent with the best interests of each child.
After two days of testimony, disposition was entered from the bench, committing Calvin III to the custody and guardianship of DCF with the child remaining with the Ws as foster parents and DCF required to make reasonable efforts to reunify the child with his parent or parents. No appeal has been taken from that judgment. Because Ellena's acknowledged father had appeared and requested custody of his daughter, enlisting his mother as the child's caretaker in his absence, and because the evidence in the record did not support the conclusion that it would be detrimental for her to be raised by her own father and his family, rather than to continue as a foster child with caretakers unrelated by blood or ethnicity, the court awarded sole custody of Ellena D. to her father, applying the presumption found in Sec. 46b-56b:
 In any dispute as to the custody of a minor child involving a parent and a nonparent, there shall be a presumption that it is in the best interest of the child to be in the custody of the parent, which CT Page 1365-WWW presumption may be rebutted by showing that it would be detrimental to the child to permit the parent to have custody.
(Passed as P.A. 85-244, S. 2, 3 to counter the holding inMcGaffin v. Roberts, 193 Conn. 393 (1984) that in Connecticut there was no presumption of parental fitness. P.A. 86-224 was passed the following year to provide for rebuttal of such presumption.)
Denise has not appealed from the judgment in the case of her son, presumably because she did not regard the refusal of the court to return him to her custody as error. The sole basis for her appeal in Ellena's case appears to be the court's failure to find that the evidence in this record rebutted the statutory presumption that the child's father should have custody upon the removal of the mother. Specifically, she claims it was error for the court to fail to make an affirmative finding that the statutory presumption had not been rebutted merely by the adjudication of Ellena as a neglected child on the nolo plea entered by John.
Factual Background
By the time the twins were born in January of 1994, Denise had been pregnant out of wedlock five times by three different men. (State's Exh. I, p. 6.) She had given birth twice, the first time to Ellena, the result of a brief relationship with John which ended before the child's birth. The second time was two years later when the twins were born, the product of her continuing relationship with their father, Calvin Jr. All three of these children were living with her and Calvin Jr. in her parents' home when the twin brother of Calvin III died and the two remaining children made subjects of these petitions. John learned of Ellena's birth belatedly, visited once and was deterred from subsequent visits by a threatening phone call received after the first visit. Nonetheless, he did not contest paternity when confronted in court by the state and was thereafter subject to orders of child support. While apparently acquiescent in Denise's excluding him from the child's life for more than two years by her passive discouragement of contact (e.g. moving without informing him of her new address or telephone number; failing to inform DCF that he could be reached through his parents) and his own reluctance to do anything about this exclusion, from the moment he learned of Ellena's removal from her mother's custody as a result of this neglect petition CT Page 1365-XXX and her subsequent placement with unrelated foster parents, he has sought to assume responsibility for her care, albeit in ways that would not be perceived as threatening to his child, to whom he initially was a stranger. He began with weekly visits, while the mother and stepfather, in whose care both twins had been physically abused, were permitted daily visits of long duration. Eventually he was granted alternate weekend visits in his parents' home, the same privilege being accorded the maternal grandparents in whose home the twins had been living at the time of their abuse. For a month during the interval between the two trial days, namely from 7/12/95 to 8/11/95, both Ellena and Calvin III were placed with John's parents while DCF investigated reported physical abuse in the home of the Ws, Calvin III's paternal grandparents. Although Ellena had done well with her father and his parents during this month in which she had daily contact with her father for the first time in her life, when the investigation was complete and the alleged abuse could not be substantiated, Ellena, along with her half-brother, was placed back in the W foster home. While the care provided to Ellena in the W. foster has never been determined by DCF to be inadequate, and her caretakers there are well known to her as Calvin III's paternal grandparents, those caretakers are unrelated to her and of a different ethnicity: Calvin Jr. is African American, both Denise and John are Caucasian.
Conclusion
Despite the fact that throughout these proceedings Ellena's acknowledged father was treated by DCF as another intervening relative, standing in line to fit in his visits with those of the intervening grandparents and maternal aunt, in fact, he is not: He is more: Upon removal from the custody of her mother, her father is presumed by law to be fit to assume her custody under the presumption of Sec. 46b-56b. Admittedly, had John asserted his right to custody from the moment the children were removed on 6/22/94, it might have been argued then that for purposes of temporary custody, an abrupt transition of a two-and-one-half year old girl to the full-time care of a biological father who was then a total stranger, at a time she was grieving the loss of her baby half-brother, would be sufficiently detrimental to rebut the statutory presumption. But after 14 months of gradually increasing contact, and with the recent experience of having spent a full month with her father and his parents without any negative response, it is clear that it would not be detrimental to her best interests to be transferred to his custody full-time. CT Page 1365-YYY
This presumption of parental fitness is of statutory dimension, enacted in response to a case in which a court had looked directly at "best interests" without first finding any detriment to a child from placement with her previously noncustodial father instead of leaving her with a grandmother with whom she had lived prior to the death of her custodial mother. McGaffin v. Roberts, supra. Enactment of the first portion of Sec. 46b-56b the following year made clear that a noncustodial parent is to be preferred to all the world upon removal of the custodial parent by death (as in McGaffin) or other cause (as here). Enactment of the second portion a year later was to ensure that such presumption could be rebutted by a showing of detriment to the child from being placed in the parent's custody in preference to that of the nonparent.
Without a showing of detriment, this presumption favoring a parent must outweigh all of the other custodial preferences touched on in the testimony of Dr. Mantell:
— Preference for placing siblings together:
 When all other factors are weighed equally, it is preferable that siblings who have long lived together should not be separated. In this case, Ellena had lived in the same home with her half-brother for the first five months of his life. The 14 months that followed kept them together by court order, at the request of DCF, in derogation of the plan proposed by the biological father. State interruption of private custodial arrangements cannot be bootstrapped into becoming a rationale for denying custody to a parent presumed to be fit by statute, on the analogy of In Re Kelly S., 29 Conn. App. 600 at 616-617 (1992).
— Preference for placing children with blood relatives.
 When all other factors are weighed equally, it is preferable for children to be placed with their own relatives rather than with genetic strangers. Giving custody to a father who has indicated his intention of delegating childcare, in his absences, to his mother is consistent with this preference for related caretakers. The alternative proposed by the mother is for Ellena to remain with the paternal grandparents of her half-sibling, unrelated by blood to Ellena, presumably because the mother's access to the child would be greatly facilitated as it has been during the past 14 months. Facilitating visits with a mother in whose care a child was neglected or abused cannot outweigh the presumption that the child's father, even if he has not previously exercised daily CT Page 1365-ZZZ responsibility for her care, should be accorded the opportunity to raise her.
— Preference for placing children with families of the same ethnicity.
 When all other factors are weighed equally, it is preferable for children to be placed with caretakers of their own ethnicity. In the absence of John's request to become Ellena's custodial parent, there is no question that Ellena should be permitted to remain in the W. foster home, even though she is white, the Ws African-American, and her half-sibling is bi-racial. Removal to the foster home of strangers where she would be neither with her brother nor with the Ws, whom she has come to know well and view as grandparents over most of her three and a half years of life, merely because of ethnicity would not be constitutionally permissible. The fact that her biological father and his parents are of the same ethnic origin as Ellena merely lends additional weight to his request for custody.
— Preference for continuity of caretaking.
 When all other factors are weighed equally, it is preferable for children to remain with their caretakers of longstanding. It is true that Ellena has been in the care of the Ws for the last one-third of her forty-three month life, but nearly three-quarters of that period has been by court order, at the request of the state. Again, applying the rationale of In Re Kelly S., supra, absent a showing of detriment if the child were to be removed, this preference cannot outweigh the presumption of her father's fitness to assume her custody.
The respondent mother mistakenly interprets the adjudication of Ellena as a neglected child as equivalent to a finding that the father did the neglecting, thus rebutting the presumption of his fitness. Fortunately, custodial decisions in this court do not rest on such mechanical application of language. Unlike in the criminal courts, where a finding of guilty means that the accused has been found responsible for violating the criminal code, in Juvenile Matters a finding of neglect does not mean that the parent or parents necessarily did anything harmful to the child, but rather that the child has been found to have beenneglected while in their legal custody. Which parent, if either, was responsible for the child's condition is relevant to disposition, not to the adjudication of neglect. Denise herself entered a nolo plea to the allegations of neglect of Ellena while in her care and custody, rather than contesting that her daughter, who had displayed in recent years no discernible CT Page 1365-AAAA physical injuries, should not be found to have been neglected. John's nolo plea, however, was not a matter of choice: Having exercised no custodial responsibilities, other than subjecting himself to orders of child support, he could have no way of knowing whether Ellena had or had not been neglected in her mother's home where her twin half-brothers had both been physically abused. He was compelled to plead "no contest" in the absence, in the practice of this court, of a plea in the nature of "no basis for entering a plea". He had no more basis to assert that the child had been neglected than to assert that she had not been neglected in the care of her mother. As an acknowledged father, however, in the absence of any custodial order vesting custody solely in the mother, he remained legally responsible for Ellena's welfare as her co-guardian under Sec. 45a-606 which was explicitly amended in 1979 to include acknowledged or adjudicated fathers of children born out of wedlock. (Public Act 79-460.) Hence he was properly named by the petitioner as a respondent parent, and was thus compelled to enter a plea. He entered the only plea he could enter without knowledge of the circumstances that led to the filing of these petitions.
Denise, however, must have such knowledge. The multiple fractures of the bones of both five-month old twins were inflicted when she and Calvin Jr. were acting as primary caretakers for these children, while living in the home of the maternal grandparents. In the absence of any explanation for these injuries (and the case was delayed — and John denied custody — for many months while the exploration of "brittle bone disease" took place) or any offer of proof that this abuse could have been inflicted by a third party, it must be concluded that either Denise or Calvin inflicted these injuries. Each must know which of them is responsible, even if the court and DCF do not. The adjudication of neglect thus does not mean that Denise inflicted harm or failed to prevent harm from being inflicted on the twins. Nor does it mean that Calvin Jr. was directly or indirectly responsible for the injuries. It means that the twins were seriously physically abused while in the care of both of their parents, and that therefore Ellena, while a member of that household, was living under conditions injurious to her well-being. The mother's appeal, wisely, does not question the propriety of denying her request for the return of Ellena to her custody since the record contains abundant evidence that the children would be at risk if returned to her at this time. Rather she appears to be claiming that since Ellena was found neglected on the nolo pleas of both parents, John is no more fit to be CT Page 1365-BBBB granted her custody than is she. In this she is mistaken: John'snolo plea was entered out of ignorance of what took place in Denise's home that resulted in abuse and neglect of the children. For whatever reason she elected to enter her nolo plea, it was not out of ignorance. Either Denise herself inflicted the injuries, thus creating a hazard for any child entrusted to her care. Or Calvin Jr. bears responsibility for the abuse, in which case Denise's continuing on-and-off cohabitation with him, and her conception of another child by him six months after removal of the children in June of 1994, suggests that the imminent risk to Ellena which warranted an OTC in June of 1994 had not been eliminated by August of 1995.
Dr. Mantell expressed these continuing concerns about the safety of the children with Denise in his testimony of 8/17/95:
 . . . in the absence of any clarification of how the twins came to harm and received the injuries that led to fractures of their bones, I think it is dangerous to place them into the care of someone who was a caretaker of them at the time that the injuries occurred . . . (Tr. . p. 17) . . . I observed her child-care ability to be minimal at best . . . I would have serious reservations about intrusting the children to the care of this young parent . . . (Id. p. 18.)
The only reservation Dr. Mantell had regarding John was his apparent insecurity in interacting with the child during a 55 minute interview on 5/3/95. He found John to be "very insecure . . . in the parental role" but even within the 55 minutes, ". . . I observed the child to interact with increasing comfort with the father." (State's Exh. K, p. 22.) No observation of his interaction with Ellena was made following the child's month-long residence in his home, seeing him daily for the first time in her — and his — life.
Neither the adjudication that Ellena was neglected in her mother's home nor the father's reluctance to compel parental intimacy in the first months of his acquaintance with his daughter rise to the dignity of the kind of detriment sufficient to rebut the statutory presumption — not preference — that upon Denise's removal as the child's custodial parent, John is the person to whom her custody must be entrusted.
Judgment entered at New Haven August 17, 1995
Articulation rendered at New Haven February __, 1996. CT Page 1365-CCCC
Frederica S. Brenneman, Judge