IN RE JUVENILE APPEAL (85–3)*
(3095)

DUPONT, C.P.J., BORDEN and SPALLONE, Js.

Argued November 7, 1984—decision released January 22, 1985

*Daniel V. Presnick,* for the appellant (mother of the minor child).

*Judith M. Earl,* assistant attorney general, with whom, on the brief, was *Joseph I. Lieberman,* attorney general, for the appellee (commissioner of children and youth services).

*Nancy I. Hoskins,* for the minor child.

---

* In accordance with the spirit and intent of General Statutes § 46b-142 (b) and Practice Book § 2026, the names of the parties involved in this appeal are not disclosed. The records and papers of this case shall be open for inspection only to persons having a proper interest therein and upon order of the Appellate Court.

SPALLONE, J. This is an appeal from the termination of the respondent mother's parental rights. The child in question was born out of wedlock on January 25, 1982. Four days later, the respondent voluntarily placed the child in foster care because she had no housing or means of support. On October 18, 1982, the child was returned to the respondent. Less than two months later, the child was again placed in foster care, this time by the respondent's parents with whom she had left the infant. On March 15, 1983, the department of children and youth services (hereinafter DCYS) filed two petitions,[1] one alleging that the child was neglected and uncared for and the other seeking to terminate the parental rights of the respondent and the child's putative father.

After a hearing on the petitions on July 28, 1983, October 4 and October 5, 1983, the child was adjudicated uncared for.[2] The parental rights of the father were terminated upon his consent; General Statutes § 45-61f (d) (4); and the respondent's parental rights were terminated upon the court's finding that the state had proven by clear and convincing evidence that, within the meaning of General Statutes § 45-61f (d) (2), the child had "been denied, by reason of acts of parental commission or omission, the care, guidance or control necessary for her physical, educational, moral or

[1] General Statutes § 17-43a (b) permits the simultaneous filing of neglect and termination petitions: "Any petition brought by the commissioner of children and youth services to the superior court, pursuant to subsection (a) of section 46b-129, may be accompanied by a petition for termination of parental rights with respect to such child as provided in section 45-61f provided notice shall be given in accordance with sections 45-61d and 45-61f. The superior court, upon notice and hearing, in accordance with the provisions of section 46b-129, may, in addition to granting the petition filed pursuant to section 46b-129, grant the petition for termination of parental rights as provided in section 45-61f."

[2] General Statutes § 46b-120 provides in pertinent part: "[A] child or youth may be found 'uncared for' who is homeless or whose home cannot provide the specialized care which his physical, emotional or mental condition requires."

emotional well-being whether such denial is the result of the physical or mental incapability of the parent or conditions attributable to parental habits, misconduct or neglect, and these parental acts or deficiencies support the conclusion that the parent cannot exercise, or should not, in the best interests of the child, be permitted to exercise, parental rights and duties." The respondent now appeals from the judgment terminating her parental rights.

The following facts are undisputed. Upon the initial placement of the child in foster care and thereafter, DCYS attempted to reunite the respondent with her child by assisting her in finding a living situation in which she could care for the child, by allowing her extensive visitation so that she could develop a relationship with the child and learn the parenting skills necessary for her to care for the child, and by supporting her in obtaining psychological counseling. Although the respondent saw a therapist and visited the child with a fair degree of regularity, she did not secure living accomodations. She consequently did not achieve the measure of progress set forth in her private service agreement with the DCYS which would allow her to regain custody of the child.

When the respondent visited the child, she relied on the various foster mothers[3] for personal support by confiding in them problems which had nothing to do with the child. She exhibited a desire to maintain the child in a stage of early infancy. She refused to allow the child to have shoes or to crawl because crawling would lead to walking, and she opposed the child's eating table food or being weaned from the bottle. She incessantly changed the child's clothes and diapers, and attempted to feed the child when the child was vomiting.

---

[3] As of October 5, 1983, the child had lived in six different homes.

The seven week period in which the respondent cared for the child by herself came about through the efforts of a foster mother who persuaded the respondent's parents to allow the respondent and the child to live with them. Prior to that time, the grandparents had not been willing to provide a residence for the respondent and the child because of the respondent's psychiatric problems. During the period in which she resided with her parents, the respondent refused to allow the parents to pick the child up, continuously held the child, and kept the child awake at night because she desired companionship. This living arrangement ended when the respondent moved in with a boyfriend. When the boyfriend, who was not the putative father, objected to having a child living in his apartment, the respondent left the child with her parents and continued to live with the boyfriend. Two days later, the respondent's parents returned the child to foster care.

Between the time of the child's birth and October 5, 1983, the respondent was hospitalized twice for two week periods because of psychiatric problems. The clinical psychologist, who at the request of the court evaluated the respondent, the child and the child's foster mother, found the respondent to be a confused, dependent, immature woman who demonstrated severe emotional and situational difficulties. It was his opinion that her borderline personality, evidenced by her repeated hospitalizations, denial of problems and self-defeating relationships with men, impaired her ability to develop an appropriate relationship with her child and to discharge child-care responsibilities adequately.

On appeal, the respondent has raised five claims of error. Having examined all of the respondent's claims, we limit our review to the two which were properly briefed. The other claims evade meaningful appellate review because counsel has not researched the issues or formulated any legal arguments thereunder.

*McGaffin* v. *Roberts,* 193 Conn. 393, 399 n.6, 479 A.2d 176 (1984); *New England Whalers Hockey Club* v. *Nair,* 1 Conn. App. 680, 682 n.2, 474 A.2d 810 (1984). The issues which we shall consider are (1) whether the court erred in failing to give the respondent the benefit of a presumption of parental fitness, and (2) whether the court erred in concluding that there was clear and convincing evidence that the respondent's parental rights should be terminated.

"When state interference is brought to bear on the parent-child relationship, the natural rights of parents in their children are to be afforded deference and, absent a powerful countervailing interest, protection." (Citations omitted.) *In re Juvenile Appeal (84-6),* 2 Conn. App. 705, 707, 483 A.2d 1101 (1984). Parenting extends beyond biology, however, and the continuing welfare of the child is a matter of legitimate state interest. *McGaffin* v. *Roberts,* supra, 400–401. Thus, although the relationship between parent and child is constitutionally protected, parental rights are not beyond limitation in the public interest. Id.

The respondent's first claim, that the trial court erred in failing to give her the "presumption of parental fitness," has no basis in the law of this state. "[T]he so-called 'parental rights' theory under which 'the parent has rights superior to all others except when he is proved unfit.' Clark, Law of Domestic Relations § 17.5, p. 591 (1968)"; *In re Juvenile Appeal (Anonymous),* 177 Conn. 648, 661, 420 A.2d 875 (1979); has never been adopted in Connecticut. Id.

In *McGaffin* v. *Roberts,* supra, the argument was raised that a presumption of parental fitness should be applied in a child custody matter. The Supreme Court rejected this argument by adhering to the statutory scheme which requires that the statutes governing child custody be construed in the best interests of any minor

child affected by them. General Statutes § 45-42b. The court noted that the biological connection between parent and child, although a factor to be considered, is not determinative of the best interests of the child, and characterized the claimed presumption as merely "an expression of the natural importance of parenthood as a factor in the determination [of] what is in the best interests of the child." *McGaffin* v. *Roberts,* supra, 406. Thus, under the "best interests" standard applicable to custody proceedings, the genetic connection between parent and child does not give rise to a presumption of parental fitness. We believe that there is, also, no such presumption, as that term is used in our law, in termination proceedings.

The standards which apply to termination proceedings are clearly and unambiguously set forth in General Statutes § 45-61f. That statute "carefully sets out and delimits four situations that, in the judgment of the legislature, constitute 'countervailing interests' sufficiently powerful to justify the termination of parental rights in the absence of consent. The commissioner of children and youth services, in petitioning to terminate those rights, must allege and prove one or more of the statutory grounds. In contrast to custody proceedings, in which the best interests of the child are always the paramount consideration and in fact usually dictate the outcome, in termination proceedings the statutory criteria must be met before termination can be accomplished and adoption proceedings begun." *In re Juvenile Appeal (Anonymous),* supra, 671–72. Compliance with the statutory criteria is not vitiated by an all-encompassing "best interests" standard; id.; and the statutory criteria are not weighed against a presumption of parental fitness.

The respondent next argues that the court erred in finding that the termination of her parental rights was supported by clear and convincing evidence. She spe-

cifically contends that there was insufficient proof that her "ongoing relationship" with the child could not be nurtured and strengthened over time. The termination of parental rights pursuant to General Statutes § 45-61f (d) (2) involves its own specific elements which must be proven by clear and convincing evidence. "[T]he trial court first determines whether the subject child 'has been denied, by reason of acts of parental commission or omission, the care, guidance or control necessary for his physical, educational, moral or emotional well-being.' General Statutes § 45-61f (d) (2). Once that has been found the court considers whether 'these parental acts or deficiencies support the conclusion that the parent cannot exercise, or should not, in the best interests of the child, be permitted to exercise, parental rights and duties.' Id." *In re Juvenile Appeal (84–AB)*, 192 Conn. 254, 262, 471 A.2d 1380 (1984). An ongoing parent-child relationship that could be nurtured and strengthened over a period of time is simply not one of the elements which must be proven under General Statutes § 45-61f (d) (2).

We have reviewed the record together with the transcript and exhibits filed in the case. On the basis of this review, we cannot find that the facts set out in the trial court's memorandum of decision are clearly erroneous. Practice Book § 3060D.

There is no error.

In this opinion the other judges concurred.