[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
NATURE AND HISTORY OF PROCEEDINGS:
Kathleen R. is a child of six and one half years of age, with a date of birth of July 14, 1984. This marks the second time that coterminous petitions have been filed concerning this child. Kathy was previously adjudicated to be neglected, and was committed to the custody of the Commissioner of the Department of Children and Youth Services, ("DCYS") on May 29, 1987. At that time the first termination petition was withdrawn by DCYS. That commitment was revoked upon petition of the mother, and with the agreement of DCYS, on August 16, 1988.
Kathleen is now the subject of coterminous petitions filed by DCYS on December 22, 1989. The petitions were last amended effective October 23, 1990, without objection of the parties.
The neglect petition alleges that the child has been physically and emotionally abused, that she is being permitted to live under conditions, circumstances, and associations injurious to her well-being, and that she has been denied proper care and attention, physically, educationally, and emotionally. The termination petition alleges that the child has been abandoned by her father, that there is no ongoing parent-child relationship with respect to the father, that the mother has failed to rehabilitate, and that the mother has, by acts of commission or omission, denied the child the care, guidance or control necessary for her physical, educational, moral or emotional well being. The petition also requests a waiver of the statutory one year requirement, as to the mother.
This case was tried over a period of three days ending on December 24, 1990. The respondent mother, Christine R., having been properly served with the petitions, was present during the trial, along with her attorney and guardian ad litem. The respondent father, Osborne R., who was served with the petitions by publication, was not present during the trial. His whereabouts are unknown.
PROCEDURE TO BE FOLLOWED:
Where neglect and termination petitions are coterminously filed under section 17-43a(e), the court is required to proceed in three CT Page 1654 separate stages.
First — Adjudication of the neglect petition.
The court must first determine, by a fair preponderance of evidence, if the child has been neglected or uncared for as of the date the petition was filed or was last amended. Neglected includes abused as that term is defined under the statutory definitions found in Section 46b-120 and Section 17-38a(b). If the petitioner's evidence does not support such a finding, then both petitions must be dismissed since both are based upon the same alleged facts. If the court finds the child to have been neglected or uncared for, disposition will be deferred until a decision is rendered on the termination petition.
Second — Adjudication, termination petition.
If the court finds the child to have been neglected or uncared for it must next determine whether the evidence provides clear and convincing proof that any pleaded ground exists to terminate the parent's rights under Section 45-61f(f). If no such ground is found, the court must return to the neglect petition to consider an appropriate disposition. If grounds to terminate are found, it must move to the final stage.
Third — Disposition, both petitions.
If grounds are found to both adjudicate the child neglected or uncared for and to terminate the rights of the parents, the court must then consider whether the facts as of the date of disposition — the last date of hearing — support by clear and convincing proof, after consideration of the six factors enumerated in Section 45-61f(h), that such termination is in the child's best interest. If the court does not find that the child's best interests would be served by terminating the parent's rights, it must return to and dispose of the neglect petition. If the court does find that termination serves the child's best interests, an order may issue terminating the parent's rights.
FACTS:
Evidence offered at trial, interpreted in the light of the prior record in this court concerning this child, of which the court has taken judicial notice, permits the finding of the following facts:
In September, 1989, Kathy was placed in a special needs kindergarten program at the Winthrop Elementary School in New London, Connecticut. Her teacher, Margaret Daniels, has a degree in special education and is currently completing her academic work for a Masters Degree in special education. CT Page 1655
Ms. Daniels, testified that on October 25, 1989 mother went to the Winthrup School with Kathy concerning a head lice problem. Upon arriving at the school office she became disruptive and was yelling, swearing, and screaming at everyone in the office including the school nurse. Kathy became so upset over her mother's behavior that she ran to Ms. Daniel's room where she hid from her mother. The child was crying and screaming hysterically that she did not want to go with her mother. Christine, who was pounding on a door in an attempt to get her daughter, continued to scream and swear. The police were called and the responding officers also observed mother yelling and screaming very loudly and using foul language. (Petitioner's exhibits #2 and #3).
Ms. Daniels testified that this had not been the first unpleasant experience with mother at the school. She had previously come into Kathy's classroom while the child was present with her classmates, including some black and hispanic students, and become upset and was yelling that she did not want her daughter going to school with "niggers" and "spics". On one occasion mother called the teacher a "fucking asshole" in front of the child and the other students. Kathy became very upset over these incidents.
On November 20, 1989 Kathy came to class wearing makeup on her face and Ms. Daniels discovered a bruise on the child's cheek under the makeup. When questioned about the bruise the child told Ms. Daniels that her mother hit her.
On November 21, 1989 the child was observed by Ms. Daniels to have dried blood in her nose and her nose was visible swollen. Kathy told her teacher that her mother had kicked her in the face because she had spilled something and would not clean it up. This incident was reported to DCYS. (Petitioner's exhibit #4).
Ms. Daniels also testified that Kathy is a disturbed child who would frequently steal toys from the classroom and who mimics the conduct and language of her mother. Kathy would swear and scram as much or more than her mother. The court finds the testimony of Ms. Daniels to be credible and persuasive.
Testimony was also received from Dorothy Williams, Kathleen Walker, Daisy Flowers, and Gladys Knox, who are current or former neighbors of mother. All four testified that Christine was a good mother, that she never hit the child, that the child was very disturbed, and that both the mother and the child needed counselling or help.
Ms. Flowers testified that while mother did not hit Kathy, she would make the then five year old child stand in a corner for up to two hours at a time as punishment. The court accepts this testimony CT Page 1656 as credible.
Dorothy Williams testified that sometime in November, 1989 Kathy stayed at her apartment overnight and suffered a severe nosebleed. The implication of this testimony, of course, is that this was the origin of the dried blood observed in the child's nose by her teacher, Ms. Daniels. That would not, however, explain the swelling of the child's nose also observed by the teacher. The court would also note the Ms. Williams, who has known Christine and Kathy for 3 to 4 years and seen Christine between two and three times per week, testified that during that entire time she only saw mother lose control of her emotions once, and on that occasion she only hollered at Kathy. In light of other evidence concerning mother's overall behavior, the court does not find the testimony of Ms. Williams to be credible.
CLINICAL EVALUATIONS:
Dr. David Mantell, a licenses clinical psychologist, conducted a psychological evaluation of mother, on August 24, 1987. He found her to be educable mentally retarded with considerable needs and limitations. He found mother to be "an intellectually limited and mentally disturbed person who does not have sufficient capacity to statisfy (sic) minimal criteria for the socialization and parenting of her daughter." (Petitioner's Exhibit 10).
Dr. Fernando Stern, a license, board certified psychiatrist, conducted two court ordered psychiatric evaluations of Christine. The first was conducted on January 30, 1990. Dr. Stern found Christine to be suffering from a Chronic Schizophrenic Disorder which requires psychiatric care. The following observations and opinions found in Dr. Stern's report (Petitioner's exhibit #7) are accepted by the court and reproduced for emphasis:
 The mother, Christine [R.], is and has for many years, suffered of a Chronic Schizophrenic Disorder. She is, in my expert opinion, unable to appropriately care for her minor child, Kathleen, this moment in time and in the very foreseeable future. If she undergoes intensive psychiatric . . . treatment, it is possible (not probable) that she will rehabilitate enough to care for the child at some time in the future. Theoretically, Ms. [R.] is rehabilitatable but it will require sophisticated psychiatric treatment, including the use of psychotrophic medication. . . . However, even if Ms. Christine [R.] does very well on psychotrophic medication and general psychiatric treatment, she is still only partially educated and needs a fair amount of supportive services in order to take care of a child. (Emphasis added).
Unless there is clear evidence that [mother] has undergone highly CT Page 1657 successful intensive treatment in the next six to 12 months, the possibility of definite out of home adoption should be considered. . . It is my expert opinion, that even without mental illness, [mother] would have severe difficulties in the bringing up of this minor alone. This, in conjunction with her rather severe mental illness, makes termination of parental rights clearly indicated at this moment in time.
Significantly, Dr. Stern found a strong positive interaction and relationship between mother and child.
 [The child] was extraordinarily happy to see her mother, running to her, jumping on her lap. Both mother and child seemed to have a close, warm relationship. The child was unwilling to pay any attention to me or participate in this evaluation when her mother was present. Clearly, there is a fair amount of love there and inspite of whether the allegations of abuse prove to be true or false, this small child surely loves her mother and her mother loves her daughter as much as she can in spite of her rather severe mental illness.
Dr. Stern's second evaluation was conducted on December 3, 1990. He found that even though mother had started psychiatric treatment there had been no major changes or improvements in her condition. He stated that she is "still not ready to care for a minor child. I do not think that she will be able to do so in the very foreseeable future. . . ." (Petitioner's exhibit #8). He also testified that in his opinion the amount of medication being given to mother by her psychiatrist is insufficient to treat her condition.
Dr. Stern testified that Christine has a "long was to go to improve". He voiced the opinion that there is no available treatment that would improve but will not be able to safely and appropriately bring up a minor child. Finally, he stated that time is of the essence with respect to finding a permanent placement for Kathy.
Dr. Mangipudi Murthy, a psychiatrist whose qualifications were neither established not stipulated to by the parties, testified for the respondent mother. He indicated that in his opinion Christine is suffering from a chronic condition which he has tentatively diagnosed as Paranoia, although he has not ruled out Schizophrenia. He has been treating Christine since September, 1990, and sees her for about 45 minutes once every two weeks. Dr. Murthy has started Christine on Trilafon, a psychotrophic medication.
Dr. Murthy's testimony was troubling. Although he has been treating Christine as a private patient for three months, he has not obtained her psychiatric history from other psychiatric clinicians nor from the institutions in which she has been treated for her CT Page 1658 psychiatric condition. He testified that he would not change his treatment approach, which is admittedly minimal, even if he has the benefit of those records. He could not give an opinion whether mother should be reunited with Kathy at this time or whether she would be capable of caring for the child within the foreseeable future. The court was not impressed with this testimony and has not given it much weight.
Kathy was placed in foster care in November, 1989. That placement was changed in March, 1990 after the child's conduct in the foster home became disruptive. She was then placed with Mrs. Betty Spash who has been a foster parent for 22 years and has cared for approximately 40 children during that time. Mrs. Spash found the child to be argumentative and unpredictable. She sought counselling for the child after an incident of physical violence by Kathy toward another child. Subsequently both Mrs. Spash and Kathy have been and continue to be seen for counseling at the Yale Child Studies Center. Kathy is being given individual psychotherapy to help her with her behavior, and Mrs. Spash is being counseled in ways to best cope with the child's problems.
The foster mother testified that the child seems to care for, but is fearful of the mother. She has told Mrs. Spash that her mother has hit her and is beginning to draw pictures strongly indicating that she has been the subject of abuse.
Mrs. Spash testified that Kathy sometimes lies but that she can tell when the child is lying. Her lies are childish, nothing big. She also testified that all children sometimes lie and that Kathy is no different in that respect. Kathy has never falsely accused any adult in the foster household of hitting or abusing her, nor is she prone to make up stories.
Kathy has violent mood swings in that she can be sweet and caring at one time and then an hour later she is out of control. She is a difficult child for Mrs. Spash to handle even with all of her experience. The child, according to the foster mother, functions best in a calm, predictable environment.
Kathy visits with her mother once each week on Mondays and talks with mother on the telephone for a minimum of five minutes every Wednesday.
Kathy has been receiving individual psychotherapy from Sarah Corn of the Yale Child Studies Center. Ms. Corn has been seeing the child once per week since August, 1990. Kathy is considered to be a disturbed child and there are concerns about her social and emotional development. She has trouble controlling her impulses but she is improving. She does not trust people very easily and attempts to control her environment, including the people around her, in CT Page 1659 order to maintain a sense of security.
Ms. Corn has never has the sense that the child lied or does not tell the truth. If the subject matter raised during a therapy session is upsetting to the child Kathy simply will not discuss it with the therapist. For example, even a minor remark by the therapist concerning her biological mother causes the child to discontinue the discussion. The child is very threatened by and sensitive about discussions concerning mother.
Mother had the benefit of a parent aide program for approximately twelve months immediately prior to the November, 1989 placement of Kathy. (Petitioner's exhibit #5). While Christine kept her appointments with the parent aide, she did not appear to make any progress during that time in developing and using the parenting skills which were the subject of that program. (Petitioner's exhibits #1 and #5).
In addition, both mother and child attended counseling sessions with Ms. Jamie Irwin at the Child Guidance Clinic between August and November, 1989. Ms. Irwin, who has a Master of Social Work Degree, worked for the clinic as a child psychotherapist. She testified that she saw Kathy and mother took Kathy to the clinic to get her "fixed". Christine did not believe that there was anything wrong with her, only the child.
Mother was observed to exercise "out of control" behavior and poor judgment by Ms. Irwin, and Kathy was observed to imitate and mimic the mother in her behavior and language. Ms. Irwin concluded that mother was doing the best she could given her limitations but that she was not adequately meeting the emotional needs of the child.
Testimony was received from Elizabeth Ball, a DCYS social worker who has been assigned to Kathy's case. The court finds Ms. Ball's testimony credible. She stated that the visits between Kathy and her mother at the DCYS office between November, 1989 and October, 1990 often involved yelling and swearing and screaming by mother. This behavior was directed both at Kathy and at Ms. Ball. Ms. Ball testified that she heard and observed mother threatening Kathy that she was going to leave her, not visit with her, and to throw out all of the child's clothing and toys from the home. On one occasion she was heard telling Kathy that "[I]f I don't get you back, that's fine. I'll just have another kid." Kathy would cry and sob as a result of these outbursts.
Ms. Ball testified that she has to intervene during almost every visit at the DCYS office because of mother's inappropriate verbal behavior toward Kathy. Ms. Ball stated that mother has berated her during the visits by referring to her as a "fucking retard" or a CT Page 1660 "thing" in front of the child, and has attempted to have the child join in in that behavior. For example, mother would Kathy to say "hi, thing"; "bye, thing" when addressing the social worker. Indeed, Kathy began to mimic her mother during such visits.
Subsequent to her evaluation by Dr. Stern in January, 1990, mother asked Ms. Ball what she should do to be able to get Kathy back. She was told that the recommendation of Dr. Stern was to receive psychiatric help and medication. Mother, according to Ms. Ball, exploded and stated that she would not go to any "shrink" and was not going to take medication. Mother was given several referrals for psychiatric assistance by DCYS; however, she did not follow up until September, 1990 when she went to see Dr. Murthy.
The only testimony concerning the child's father is that he has not had any contact with DCYS since October, 1989 and has seen the child only once since 1986.
The court cannot help but note that during the trial mention was made on several occasions of efforts made by the parties to enter into a service agreement between mother and DCYS. The parties were unable to agree upon the terms of that service agreement which included psychiatric treatment for the respondent mother. Consequently, although there clearly was a need for mother to engage the services of a psychiatrist early in 1990, she apparently was not instructed to do so by her attorney because he could not agree with DCYS as to the terms of a service agreement.
ADJUDICATION — NEGLECT PETITION:- as of October 23, 1990.
Section 46b-120 of the General Statutes provides that a child or youth may be found "neglected" who (i) has been abandoned or (ii) is being denied proper care and attention physically, educationally, emotionally or morally or (iii) is being permitted to live under conditions, circumstances or associations injurious to his well-being or (iv) has been abused.
The court finds that the petitioner has proven by a fair preponderance of the evidence that Kathy is a neglected child in that she has been abused both physically and emotionally by her mother, and she has been permitted to live under conditions or circumstances injurious to her well being.
The court accepts as credible the testimony of Elizabeth Ball and Margaret Daniels concerning their observations of Kathy and Christine and finds it to have been proven that the child suffered emotional abuse in the school and during DCYS supervised visits as a result of mother's conduct and behavior. The court finds by a fair preponderance of the evidence that the child was struck by her mother in November, 1989, resulting in a bruise and bloody, swollen CT Page 1661 nose. The court also finds that requiring a five year old child to stand in a corner for up to two hours at a time as punishment constitutes physical abuse.
As a result of this physical and emotional maltreatment the court finds that Kathy was being permitted to live under conditions and circumstances injurious to her well-being and that she was denied proper care and attention physically and emotionally as of October 23, 1990, the date of adjudication.
The court adjudicates Kathy to be a neglected child.
WAIVER OF THE ONE YEAR REQUIREMENT: as to the respondent mother.
The court is empowered to waive the requirement that one year expire prior to terminating parental rights if it finds by clear and convincing evidence that it is in the best interest of the child to do so. Conn. Gen. Stat. Sect. 45-61f(g). However, the facts found by the court, supra, indicate that the emotional abuse suffered by the child began prior to October 23, 1990 existed for more than one year. Therefore, a waiver of the one year statutory requirement is unnecessary.
ADJUDICATION — TERMINATION PETITION: as of October 23, 1990.
"Since termination of parental rights is the ultimate interference by the state with the natural rights of parents in their children, resulting in an everlasting severance of the legal relationship, and usually the permanent separation of parent and child as well, courts must require strict adherence to statutory standards." In re Migdalia M., 6 Conn. App. 194, 203, (1986).
ABANDONMENT:
The Connecticut General Statutes sections 17-43a(b)(1) defines abandonment as the parents' failure "to maintain a reasonable degree of interest, concern or responsibility as to the welfare of the child."
 "Where a parent fails to visit a child, fails to display any love or affection for the child, has no personal interaction with the child and no concern for the child's welfare, statutory abandonment has occurred." In Re Rayna N., 13 Conn. App. 23, 36
(1987).
The evidence is both clear and convincing the father has abandoned this child in the statutory sense. He has only seen Kathy once in four years and has expressed no interest or concern to DCYS concerning the child in almost one year. The court finds that the petitioner has proven this ground for terminating the parental CT Page 1662 rights of the respondent father by clear and convincing evidence and further finds that this condition has existed for more than one year.
NO ONGOING PARENT-CHILD RELATIONSHIP:
Section 17-43a of the Connecticut General Statutes defines this ground as the absence of an:
". . . ongoing parent-child relationship which means the relationship that ordinarily develops as a result of a parent having met on a day to day basis the physical, emotional, moral and educational needs of the child[ren] and to allow further time for the establishment or re-establishment of such parent-child relationship would be detrimental to the best interest of the child[ren]."
Kathy is six and one half years of age, and she has not seen her father for the past four years. There has been no interaction between father and child nor has father met any of the needs of the child during that time. It is clear that under those circumstances there can be no ongoing parent-child relationship in existence, and thus the court finds that this ground for terminating father's parental rights has been proven, and that this condition has existed for more than one year.
Even though no parent-child relationship exists, that alone is not grounds to terminate a parent's rights. The court must also find by clear and convincing proof that to permit further time to establish such relationship would be detrimental to the best interest of the child.
A father who has not seen his child for four years, and who has not even attended the court proceedings which are to determine his parental rights, is not likely to involve himself in the life of the child in the reasonable foreseeable future.
Kathy is a child with special needs who has been in foster care for the past year. She needs a permanent home and permanent and loving, caring caregivers. It would be detrimental to her best interest to require her to wait any longer to determine whether her father will ever decide to make an appearance in her life.
The court finds that the petitioner has proven this ground for terminating father's parental rights by clear and convincing evidence.
FAILURE TO REHABILITATE:
The petitioner has pleaded failure to rehabilitate as one of the CT Page 1663 grounds for terminating parental rights. By definition and by their very nature, coterminous petitions concern children who are not adjudicated neglected or uncared for an committed to DCYS. While Kathleen was adjudicated neglected and committed to the custody of DCYS on May 29, 1987, that commitment was revoked on August 16, 1988. She was not adjudicated or committed child at the time of the filing of the petition on December 22, 1989.
Section 17-43a, entitled "Termination of parental rights of child committed to commission", states in subsection (a): "In respect to any child committed to the commissioner of children and youth services in accordance with section 46b-129 . . . the commissioner . . . may petition the court for the termination of parental rights with reference to such child . . ." Subsection (b) of the statute provides four grounds for terminating parental rights, including failure to rehabilitate. Subsection (e) of the statute permits the filing of coterminous petitions under Sections 46b-129 and 17-43a, "notwithstanding that such child has not been committed to the commissioner of children and youth services." However, the statute goes on to state that the superior court "may, in lieu of granting the petition filed pursuant to 46b-129, grant the petition for termination of parental rights as provided in section 45-61f." (Emphasis added). Section 45-61f does not include failure to rehabilitate as a ground for terminating parental rights.
The court finds that this ground is applicable only in those cases where the child is currently committed to the custody of the Commissioner of the Department of Children and Youth Services. Since that is not the situation in this case, the ground alleging failure to rehabilitate is dismissed.[1]
ACTS OF OMISSION OR COMMISSION:
In order to terminate mother's parental rights on the ground of acts of commission or omission under Section 17-43a(b)(3) or Section 45-61f(f)(2) the Court must clearly and convincingly find that the child was denied the care, guidance or control necessary for her physical, educational, moral or emotional well-being as the result of an act or acts of commission or omission by the mother. Without proof of deprivation of care, this ground cannot be found. In Re Juvenile Appeal, 192 Conn. 254, 267 (1984).
When considering whether the petitioner has met her burden of proof concerning alleged acts of commission or omission the court engages in a two step process. First the court must determine whether the child has been denied by reasons of acts of parental commission or omission the care, guidance and control necessary for his physical, educational, moral, or emotional well-being. If such conditions exist, the court must next determine whether "these parental acts or deficiencies support the conclusion that the parent CT Page 1664 cannot exercise, or should not, in the best interest of the child, be permitted to exercise parental rights and duties." In re Juvenile Appeal (84-AB), 192 Conn. 254, 262 (1984); In re Juvenile Appeal (85-3), 3 Conn. App. 194, 200 (1985). Both steps must be proven by clear and convincing evidence. (Id. at 267).
Adjudication: as of October 23, 1990.
In the instant case the court finds that those fact which gave rise to the court's adjudication of neglect, supra, have also proven by clear and convincing evidence that this child has been denied by reasons of acts of parental commission or omission the care, guidance and control necessary for her physical; educational, moral, or emotional well-being with respect to the termination petition.
Best interest of the child: as to December 24, 1990.
The court finds that mother's conduct, and its effect upon the child, are primarily manifestations of Christine's mental illness. What is not at all clear is what changes are likely to result from a significant period of psychiatric therapy combined with the appropriate dosage of psychotrophic medication.
Dr. Stern, in his evaluation and recommendations of January, 1990, suggested that mother should undergo intensive therapy for six to 12 months. As of the last day of trial mother had only been receiving psychiatric treatment for approximately three months, and that treatment may not have been sufficiently intense to be adequate.
While it is true that mother did not follow through with the treatment recommendation of Dr. Stern, as related to her by Ms. Ball in March, 1990, the court is well aware, as are the attorneys to this action, that in large measure mother's failure to seek treatment may have been due to the inability of DCYS and the attorneys for the petitioner and the respondent to agree upon the terms and conditions of a proposed service agreement. This inability of the attorneys to agree to what was obviously and clearly in the best interest of both mother and child, and thus impress upon her the need for such treatment, is very disturbing to the court.
Additionally, according to Dr. Stern, mother had not been receiving the appropriate dosage of medication required for her condition. If a physician is not properly or adequately treating a patient, and the court does not necessarily assume that such is the situation in this case, the patient can hardly be criticized or penalized if her condition does not improve.
Dr. Stern, in his initial evaluation and report of January, 1990, indicated that while it was possible to treat mother's condition, it CT Page 1665 was not probable that she would be capable of caring for her child in the foreseeable future. Yet, he also indicated that mother will need a fair amount of supportive services in order to take care of the child, suggesting that she would be able to care for the child with supportive services. His evaluation of approximately ten months later resulted in the conclusion that even though mother had started psychiatric treatment there had been no major changes or improvements in her condition and that she is "still not ready to care for a minor child." (Emphasis added). Dr. Stern testified that Christine has a "long way to go to improve". She will improve but will not be able to safely and appropriately bring up a minor child. The court finds Dr. Stern's opinions and conclusions to be somewhat equivocal suggesting that while "she is still not ready", she may become able, with support, to care for her child.
It is clear to the court that mother can not currently care for Kathy; however, the court does not accept Dr. Stern's conclusions as clear and convincing evidence that mother will not be able to, and should not, in the best interest of the child, be permitted to, exercise parental rights and duties in the future.[2]
This is not a case wherein mother has never cared for or has always been unable to properly care for this child. The earlier commitment of the child was revoked with the approval of DCYS. The court can and does infer from that earlier rehabilitation and reunification, given the mandate of the agency to protect such children, that DCYS believed as of August, 1988 that Christine was capable of safely and adequately caring for her daughter.
It may well be that mother will not improve to the point where she can care for Kathy, or that Kathy's condition will be such that returning her to the custody of mother will never be in her best interest; however, the evidence does not clearly convince the court that such is the case at this time. In fact, this court is not convinced that, given proper and adequate psychiatric treatment and support services, mother will not be able to resume meaningful parenting position in the life of this child in the reasonably foreseeable future.
It is the finding of the court that the psychiatric treatment thus far given to mother, and the time to determine whether a continuation of such treatment will be effective, have been insufficient to permit the court to determine whether appropriate psychiatric treatment, over a reasonable period of time, will permit mother to resume her role as a parent. The court also does not find that because of her mental illness, and prior personal history, it is most unlikely that she will ever be able to develop the skills needed to care for this child's special needs with or without extensive support services. See: In re Juvenile Appeal (84-3),1 Conn. App. 463, 478 (1984). CT Page 1666
Therefore, the court finds that while the petitioner has proven that the child was denied the care, guidance or control necessary for her physical, education, moral or emotional well-being as the result of an act or acts of commission or omission by the mother, the petitioner has not proven, by clear and convincing evidence, that mother should not, in the best interest of the child, be permitted to exercise parental rights in the future or that her parental rights should be terminated.
Pursuant to Section 45-61f(h) of the Connecticut General Statutes the court in considering a termination petition must consider the following six factor:
 (1) Mother was provided with the services of a parent aide, as well as psychological counseling for herself and Kathy with the Child Guidance Clinic. In addition, she was given psychiatric evaluations by Dr. Stern followed by referrals by DCYS for psychiatric therapy. All of this was in addition to a schedule of weekly supervised visits with the child. The father was not offered services as his whereabouts are unknown.
 (2) The only court orders entered in this case were those related to psychotrophic and psychological evaluations. Mother complied with those orders. No orders were entered as to the respondent father.
 (3) Kathy has strong emotional ties with her mother. The child's emotional state is such that she has difficulty in establishing relationships with others. The child has not emotional ties with the respondent father.
(4) Kathy is six years old with a date of birth of July 14, 1984.
 (5) Mother has made some efforts to effect a reunification with her child by participating in psychiatric treatment, by consistently visiting with the child and remaining in contact with DCYS. The psychiatric treatment she has received is not yet sufficient, but since it is continuing, the efforts of mother are continuing. The father has not made any efforts to make a reunification with Kathy possible. He has abandoned the child and has not maintained contact with DCYS.
 (6) Neither parent has been prevented from seeing and establishing or maintaining a meaningful relationship by the unreasonable act or any party. Economic circumstances were not a factor in this case.
JUDGMENT CT Page 1667
Having found proven two grounds for terminating the parental rights of the respondent father, it is further found by clear and convincing evidence to be the best interests of Kathleen for her father's parental rights to be terminated. It is therefore ORDERED that the parental rights of Osborne R. in and to his daughter Kathleen R. are hereby terminated.
While the termination petition with respect to the respondent mother has been dismissed as being inapplicable and/or not having been proven, the court has adjudicated the child to be neglected and thus must consider the disposition of that petition.
The court find, having reviewed the social study, and based upon the weight and the sufficiency of the evidence, as well as the credibility of the witnesses, that mother is not currently capable of adequately or properly caring for this child. It is the finding of the court that it is in the best interest of the child to be committed to the care and custody of the Commissioner of the Department of Children and Youth Services and it is ORDERED that the child be so committed for a period not to exceed eighteen months.
The expectation of the court with respect to mother as a means of reunifying this family are: mother is to remain in contact with DCYS and keep her appointments with that agency; she is to visit with Kathy as often as DCYS will permit, and she is not to berate either the child or the social worker while in the child's presence, during such visits; she is to continue to participate in individual psychiatric therapy and continue to take the psychotrophic medications prescribed for her, without interruption; she is to participate in Kathy's therapy at such time and to such degree as recommended by the child's therapists; she is to remain alcohol free and have no involvement as a defendant with the criminal justice system. The court believes that a more intense program of psychiatric treatment is necessary for mother, and to the extent that is possible it is included as an expectation of the court.
DCYS is expected to provide mother with parenting and homemaking assistance, regular supervised visits with the child, and referrals for appropriate and intensive psychiatric treatment. Additionally, DCYS is expected to provide Kathy with continuing psychological and/or psychiatric treatment. The Commissioner is also ordered to submit a written status report to the court concerning this case within six months of this date.
Dated at Montville this 4th day of February, 1991.
TERENCE SULLIVAN, JUDGE