[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
THE COURT'S ARTICULATION
In response to respondent's mother's Motion for Articulation, the court having already made its statutory findings and rendered an opinion accordingly states that, having presided over the trial and having analyzed the subsequent briefs filed by all parties, found the briefs of the petitioner and the children as persuasive and adopts their findings as accurate as to the facts and the law and adopts them as amended by the court. Thus they are incorporated into the court's articulation.
The respondent's mother's brief argues that the evidence supports the findings. The court disagrees. The evidence presented by the petitioner and the children by clear and convincing evidence that the respondent failed to meet any of the statutory requirements. The respondent's testimony failed to refute or rebut any of petitioner's claims. Her testimony consisted of a series of excuses as to why she created the situation that led to the court's findings.
Neither she nor her witness provided any evidence that could persuade the court that it should not find against her in both the adjudicatory and dispositional portions of the trial.
Based on her choice of life styles, she had her two children committed to the Department of Children and Youth Services (DCYS) on June 5, 1984. And, as the evidence showed, she failed in each and every attempt that the Department of Children and Youth Services made to assist her up to May 5, 1989 and after as testified to by Nancy Greico, DCYS Social Worker. The respondent failed to satisfactorily meet any of the service agreements and thus never modified her behavior to the degree that merited the return of her children in neither the adjudicatory nor dispositional phases.
As a consequence, both of petitioner's doctors testified supporting the petitioner's contentions; Dr. Barbara Berkowitz as to the Respondent's condition prior to May 5, 1989, the adjudicatory phase, and Dr. Catherine Terri Lee, M.D. regarding the dispositional phase.
Also Mrs. Greico testified that respondent failed to meet the requirements of any of the treatment plans in the adjudicatory phase, namely plans dated June 20, 1985 up to December 2, 1988: and plans during the dispositive phase. The plans are State's CT Page 8348 Exhibit D.
A. HISTORY OF THE CASE
On May 5, 1989, the Commissioner of Children and Youth Services filed a petition on behalf of Michelle and Deana Cross seeking to terminate the parental rights of Margaret O'Brien. She alleged that both children had been abandoned by their parents, that both parents had failed to personally rehabilitate themselves, that the children had been denied by the reason of act of commission or omission the care, guidance and control necessary for their physical, educational, moral or emotional well-being, and that there was no ongoing parent-child relationship as defined by law. The Commissioner also alleged that those previous statutory bases for termination had existed for not less than one (1) year. Psychological evaluations were ordered on June 13, 1989. The evaluation was filed in court on January 8, 1990. Prior to taking evidence at the commencement of the trial on May 8, 1990, it was determined that any evidence after May 5, 1989 will be considered solely for dispositional purposes.
The trial took place on May 8, 22 and 30 of 1990. As part of her case-in-chief, Petitioner called Dr. Barbara Berkowitz, Ph.D., a licensed psychologist who performed two (2) court-ordered evaluations — one submitted in June of 1986 and the second submitted in February of 1987: Dr. Catherine Terri Lee, M.D., from the Yale Child Study Center, who performed the court-ordered evaluation submitted in January 1990; Ms. Viola Dukes, foster mother to Michelle and Deana and Nancy Grieco, DCYS Social Worker.
The only other witnesses heard in this matter were on behalf of Margaret O'Brien. The Respondent-mother testified on her own behalf and she also called the Rev. Joseph Norfleet, minister of the Faith Center Church and also Chief of Security at the Connecticut Department of Corrections.
B. FACTS
The following testimony was uncontroverted:
1. Michelle and Deana were committed to the Department of Children and Youth Services on June 5, 1984.
2. The children entered foster care when Michelle was approximately eighteen (18) months old and Deana was about six (6) months old.
3. Prior to entering foster care, the children had only lived with their biological mother. CT Page 8349
4. The children at the time of the trial on the petition for termination of parental rights had been in foster care for six and one-half (6 1/2) years.
5. In the adjudicatory phase Dr. Barbara Berkowitz testified based upon the conclusions she reached as a result of her two (2) prior court ordered psychological evaluations. (Ex. A). The first was in 1986, and the second in 1987 some seven months later.
6. She stated that regular, consistent and frequent contact with the parent is of the upmost importance. She stated that this was very important because children need to be able to depend upon a caretaking individual. If they are unable to depend upon their caretaker it interferes with their ability to attach to others. She further testified that Ms. O'Brien was immature, given to impulsive behavior, and used poor judgment. In the second evaluation, the doctor stated that the respondent had not changed her personality nor parenting style. She stated that she recommended termination then and would do so again at trial if the respondent had not modified her behavior based on her prior evaluations.
7. Dr. Berkowitz stated that it was in the best interest of Michelle and Deana to stay with and be adopted by the foster mother, Viola Dukes, if at all possible. To do otherwise would break the girls' attachments that had built up over the years with Ms. Dukes. Any change in placement would be quite disruptive to these two (2) children.
8. Dr. Berkowitz also testified that, assuming her recommendations in her report of 1987 were not followed, termination of the parental rights of Ms. O'Brien would be even more important for the children. She based her opinion upon her expertise in the areas of special needs, adoptions and adult adoptees.
9. In the dispositional phase, Dr. Catherine Terri Lee, M.D. testified about her observations when she conducted a court ordered parent-child psychiatric evaluation. She testified that Deana's need to control adults around her inconsistent with a child who has experienced disruption in her caregivers.
10. She noted that both children recognized that Ms. O'Brien could not meet their needs as children.
11. Dr. Lee also testified that Michelle felt the need to be a parentified child. This is indicative of a child who has experienced unreliable and inconsistent caregivers. It has a negative impact on the child's development because the child will CT Page 8350 have difficulties developing intimate and trusting relationships.
12. She felt that Ms. O'Brien will not be able to meet these children's needs.
13. Dr. Lee stated that Ms. O'Brien placed her own emotional needs before those of the children. Ms. O'Brien abruptly discontinued visits with her children because of her own distress. The Doctor testified that she was familiar with the reports of Dr. Berkowitz, used them in conducting her assessment of Ms. O'Brien, and saw no progress in dealing with the personality and parenting deficiencies observed by Dr. Berkowitz over three years earlier.
14. Dr. Lee also noted that the infrequency of the visits also had a negative effect on the children's self-esteem.
15. The foster mother, Ms. Viola Dukes stated that she was interested in becoming the children's adoptive mother if they should be freed for adoption.
16. She testified that, when the children first came into her home, they were hyperactive and hard to control, but now they are under control and have no behavior problems.
17. Nancy Greico, DCYS case worker in this matter testified she became involved in this case in April, 1985 and worked toward family reunification through the improvement of the mother's and father's parenting skills.
18. Mrs. Greico testified that counseling and parent-aide services were offered to Ms. O'Brien and that she clearly communicated the Department's plans and expectations to her.
19. In treatment plans introduced collectively as State's Exhibit C covering the period June, 1985 through December 1989 and in her court testimony, Mrs. Greico consistently noted that Margaret O'Brien was unable to meet the Department's expectation and had made no progress in attempting to have her children returned.
20. Nancy Greico testified that many of the elements of Service Agreements introduced as State's Exhibits D-1 through D-7 were not complied with by Margaret O'Brien.
21. Nancy Grieco, DCYS social worker, testified that Ms. O'Brien failed to visit her children from February 19, 1989 through June 3, 1989.
22. She also testified that, between May 5, 1989 and March 2, 1990, Ms. O'Brien had six (6) visits with her children and CT Page 8351 called the foster home eight (8) times.
23. During the time when she had the opportunity to have weekly visits with her children, of the forty-four (44) weeks available, Ms. O'Brien only made four (4) visits to her children. Also during the same time, she forgot her daughters' birthdays.
24. Prior to the March 6, 1990 court hearing, Ms. O'Brien failed to attend the five (5) previous scheduled hearings on the termination of parental rights petitions.
25. Ms. Greico testified that counseling, the services of a parent-aide, and weekly visitation were offered to both parents.
26. She also testified DCYS' expectations of MS. O'Brien were communicated to her by providing her with a copy of the treatment plan every six months with an opportunity to discuss it and service agreements drawn between DCYS and each parent.
FINDINGS
A. INTRODUCTION
Michelle and Deana Cross have been in foster care for six and one-half (6 1/2) years. At the time of trial, the girls were seven (7) and six (6) years old. They have resided in a home other than one provided by either of their parents for the vast majority of their short lives. Prior to the filing of the termination petitions, the Commissioner offered a variety of services to both of the respondent-parents in an effort to either reunify Michelle and Deana with their biological mother, Ms. O'Brien.
According to the testimony, petitions to terminate the parental rights of Ms. O'Brien were filed because, despite the best efforts of DCYS, the mother is incapable of making the changes necessary that would allow the Commissioner to place Michelle and Deana in her care and, considering the ages and needs of these two children, to allow further time for change is unreasonable.
1. Standard of Proof
The courts have held that one or more of the statutory grounds set forth in 17a-43a must be proven by clear and convincing evidence. In Re Juvenile Appeal (84-3), 1 Conn. App. 463. The "clear and convincing" standard of proof is constitutionally mandated. Stanosky v. Kramer, 455 U.S. 745, 102, S.Ct. 1388. It refers to a standard of proof between a fair preponderance of the evidence, the standard required in ordinary civil action, and beyond a reasonable doubt, the standard required CT Page 8352 to find criminal guilt. Dacey v. Connecticut Bar Assn., 170 Conn. 520; In Re Juvenile Appeal (84-3), 1 Conn. App. 463. It is "more than average certainty on the part of the factfinder." Santosky v. Kramer; In Re Juvenile Appeal (84-3); Cookson v. Cookson,201 Conn. 229 (1986).
When all the evidence available to a factfinder allows inferences which are consistent either with culpability or innocence, that factfinder is not required to select those inferences favoring one finding over another merely because the clear and convincing standard is greater than the civil preponderance standard. State v. Dumlao, 3 Conn. App. 607,491 A.2d 404 (1985). See In Re Christine F., 6 Conn. App. 360, 366
(1986).
Moreover, there is no presumption of parental fitness in Connecticut, In Re Juvenile Appeal, 3 Conn. App. 194 (1985). In Re Juvenile Appeal, 177 Conn. 648 (1979). While parents have a constitutionally protected interest in raising their children, this right may be circumscribed in those cases where the State's parens patriae interest in the well being of children is found by law to supersede this parental interest. (emphasis added). In Re Juvenile Appeal, (83-DE), 189 Conn. 66. This case is one where Petitioner's parens patriae interest supersedes the Respondent's constitutionally protected parental interest in raising her children. The children's length of out of home placement, the lack of progress towards reunification, and the lack of recognition by the Respondent of the children's needs justifies the termination of Ms. O'Brien's parental rights.
The Connecticut Supreme Court has recently stated:
 Under 17-43a, however the trial court's obligation is not to make an unguided investigation of the respondent's "fault" in determining whether to grant a petition to terminate parental rights, any more than its disposition is intended to reflect some moral judgment respecting a parent whose rights are terminated. In Re Luis C., 210 Conn. 157, 168
(1989).
The court stated in its opinion that statutory criteria could not be invalidated because that criteria mandates termination even though the parent was simply "personally incapable of overcoming deficiencies in parenting skills." Id., at 168-69.
B. ABANDONMENT
The statutory ground for termination of parental rights based CT Page 8353 upon abandonment is met if a parent fails to maintain a "reasonable degree of interest, concern or responsibility" about their child. Connecticut General Statutes 17-43a(b)(1). The Supreme Court interpreted the obligations of parenthood as: "(1) express love and affection for the child; (2) express personal concern over health education and general well being of the child; (3) the duty to supply the necessary food, clothing, and medical care; (4) the duty to provide an adequate domicile and (5) the duty to furnish social and religious guidance." In Re Juvenile Appeal (Docket #9489), 183 Conn. 11, 15 (1981). The court noted that the focus of this ground is on parental conduct. Id., at 14.
Michelle and Deana's abandonment by their biological mother is clear. While she made efforts in 1987 and 1988, she visited them fewer and fewer times up to May 5, 1989. She only visited the girls twelve (12) times between December 10, 1988 and February 19, 1990. Eight (8) of those visits took place prior to the filing of the termination petitions. Until 1990, Respondent-mother had the opportunity to have weekly visits with her children. That was then reduced to every other week because of her failure to remain in contact with DCYS or the children.
The DCYS worker testified that the mother has not taken the steps necessary to secure an adequate dwelling for Michelle and Deana, allowing them to remain in foster care for six and one-half (6 1/2) years. Nor has she taken any steps to provide social or religious guidance to these girls. For the past four (4) years, Ms. Dukes has acted as the girls foster-mother, becoming over the course of time their psychological parent.
Her efforts in this case can, at best, be described as sporadic. The court finds by clear and convincing evidence based upon the evidence presented at trial, Ms. O'Brien has abandoned Michelle and Deana within the meaning and intent of Connecticut General Statutes 17-43a(b)(1).
C. ACTS OF OMISSION OR COMMISSION
The Connecticut Supreme Court, when examining the constitutionality of this statutory ground's predecessor, stated: "The evil to be avoided is any conduct on the part of the parent that would deny the child in question the care, guidance or control that would foster his well-being." State v. Anonymous,179 Conn. 155, 164 (1979). The court also noted, "It is true that these somewhat general phrases encompass a wide variety of conduct, but the process of parenting itself is multifaceted and encompasses all of lives activities." Ibid. The trial court noted, in In Re Shannon S., that "the same evidence certainly can establish more than one ground for termination." 41 Conn. Sup. 145,157 (1989). The Appellate Court has found that even CT Page 8354 circumstantial evidence is sufficient for Petitioner to meet her burden of proof under this statutory ground. In Re Juvenile Appeal (85-2), 3 Conn. App. 184, 193 (1985); In Re Christine F.,6 Conn. App. 360, 367 (1986).
Since the placement of Michelle and Deana at the ages of eighteen (18) months and six (6) months respectively, Ms. O'Brien has been involved in criminal activity which has resulted in her brief incarceration and her involvement in the Supervised Home Release Program. Ms. O'Brien has never complied with any of the many service agreements completely. Despite numerous attempts, she has failed to follow through with recommended counseling and visitation. (Ex. D). The steps necessary to have the children returned to her care were solely within her control. Her failures to act have led to Michelle and Deana languish in uncertainty for a period of six and one-half (6 1/2) years.
Based upon the evidence presented at trial, the court finds that the statutory ground involving the acts of omission and commission were met by clear and convincing evidence.
D. FAILURE TO REHABILITATE
Section 17-43a(b)(2) states that termination lies in those cases where a child has been previously adjudicated uncared for or neglected and the parents have failed to achieve such degree of personal rehabilitation as would encourage a belief that within a reasonable time, given the age and needs of the child, they could assume a responsible position in the life of the child.
The fact that the children were previously found to be uncared for and neglected is a matter of court record, as are the reasons for commitment. The court takes judicial notice of the previous files. McKenzie v. Town Planning and Zoning Commission of Trumbull, 149 Conn. 678 (1962). Carpenter v. Planning and Zoning Commission of Town of Stonington, 176 Conn. 581 (1979). Mirton v. Sullivan, 36 Conn. Sup. 615 (1980).
The guidelines for determining rehabilitation were set forth earlier. Those guidelines basically require the Respondent to demonstrate an understanding of her children's specialized needs, an ability to parent her children, and a consistent pattern of visitation with them.
The Appellate Court, in In Re Migdalia M., 6 Conn. App. 194,504 A.2d 533 (1986), characterized "[a]ttempts to achieve contact with a child, telephone calls, the sending of cards and gifts, and financial support" as "indicia of interest, concern and responsibility for the welfare of a child" within the meaning of Connecticut General Statutes 17-43a(b)(2). This section CT Page 8355 "requires the trial court to analyze the respondent's rehabilitative status as it relates to the needs of the particular child, and further that such rehabilitation must be foreseeable "within a reasonable period of time." In Re Luis C., at 167 (emphasis added).
Many services were offered to the respondent since Michelle and Deana were first committed. These services included therapy, both individual and family a parent-aide visitation and transportation to visits. DCYS also clearly informed her that she was expected to visit on a regular and consistant basis, obtain a stable source of income, obtain suitable housing and remain in regular contact with the agency. These expectations were communicated to Ms. O'Brien in two ways. First, she was informed of DCYS' expectations via the treatment plans, which were completed every six months. (Ex. C). Second, she was informed of DCYS' expectations through service agreements which she entered into with DCYS on a periodic basis. (Ex. D).
Ms. O'Brien never followed through with the recommended group therapy for abusive/neglectful mothers by attending the weekly meetings on a regular basis. Nor did Ms. O'Brien secure adequate housing and furniture to enable herself to take advantage of overnight visitation with her daughters. Ms. Greico testified that Ms. O'Brien would easily cancel a visit if an opportunity arose to do something more preferable.
Dr. Barbara Berkowitz stated "Margaret O'Brien has not made significant changes in her personality style nor her parenting style and capabilities." (Ex. A-2, p. 10).
Dr. Berkowitz testified that she would now recommend the termination of Ms. O'Brien's rights because of her failure to follow through on her recommendations three years ago and because the children had been in a stable environment for the past four years.
Regarding the dispositional phase, Dr. Catherine Terri Lee echoed Dr. Berkowitz, in her report, when she stated "Ms. O'Brien persists in placing her own emotional needs before those of her children." (Ex. B, p. 14).
Dr. Lee also noted that the children's sole psychological parent was Ms. Dukes, the children's foster-mother of four years. "Psychological testimony is rightly accorded great weight in termination proceedings." In Re Nicolina T., 9 Conn. App. 598,605 (1987) citing In Re Juvenile Appeal (Anonymous), 177 Conn. 648,667 (1979).
Michelle and Deana, at the time of the trial, were seven (7) CT Page 8356 and six (6) years old. The girls had been in foster care for six and one-half (6 1/2) years. Dr. Lee noted that both children showed effects of experiencing inconsistent caregivers in the past. Both Drs. Berkowitz and Lee stated that these children could wait no longer for their biological mother to make the necessary changes in her life.
The court finds by clear and convincing evidence that Ms. O'Brien has not rehabilitated herself within the meaning of Connecticut General Statutes 17-43a(b)(2). It is also clear that to allow further time, considering the ages and needs of the children, they could assume a responsible position in these girls' lives within a reasonable period of time.
It is in Michelle and Deana's best interests to terminate Ms. O'Brien's parental rights.
Having found that grounds for termination exist the court makes the determination that the termination is in the best interest of each child using the criteria of Sec. 17-43a(d). The court finds that all of the elements of that statute have been proven by a clear and convincing evidence and has previously made written findings pursuant to that statute.
As stated earlier, many types of services were offered to Ms. O'Brien to assist her in improving her parenting skills and her relationship with their children. These services were tailored to her situation by Mrs. Nancy Greico and were offered over a five year period in an effort to facilitate the reunion of the children with a parent.
Exhaustive court ordered evaluations by both a clinical psychologist and a psychiatrist were completed. It may be noted here that her compliance with the ordered evaluation was marred by her frequent failure to keep appointments.
Much evidence was produced through Drs. Lee and Berkowitz as well as Viola Dukes and Mrs. Greico concerning the feelings and emotional ties of Michelle and Deana to their mother and to their foster mother. It is clear that while the children recognize the existence and nominal status of their mother, they look to Ms. Dukes as their caretaker. Dr. Lee testified that in her opinion, Viola Dukes was the psychological parent of both children.
Michelle is seven (7) years old and Deana is six (6) years old. They have both been in foster care with minimal contact with their mother for most of their lives.
This articulation has previously discussed the minimal efforts made by Ms. O'Brien to adjust her circumstances, conduct CT Page 8357 and condition so that it would be in the best interest of the children to be reunited with her. Visitation was sporadic with, frequent, long, dry spells. Service agreements were consistently not lived up to. Psychotherapy and counseling opportunities were ignored. All this even after the mother was informed by the state that further non-compliance on her part would lead to this proceeding for termination.
Testimony disclosed only recent and limited effort to prevent the mother from maintaining a reasonable relationship with the children. Nancy Greico testified that some limits were set on overnight visitations for the protection of the child. These limits were reasonable under the circumstances and only recent in the five year history of the case.
EDWARD J. LEAVITT, JUDGE